Albert REITER, et al., Plaintiffs,

v.

**MIDLAND ROSS CORPORATION,
et al., Defendants.**

No. C83–3374–Y.

United States District Court,
N.D. Ohio, E.D.

June 1, 1992.

William J. Madden, Sharon, PA, for plaintiffs.

James A. Rydzel, Robert P. Ducatman, Jones, Day, Reavis & Pogue, Mark A. Rock, Schwarzwald & Rock, Cleveland, OH, and Richard J. Brean, United Steelworkers Of America, Office Of General Counsel, Pittsburgh, PA, for defendants.

### MEMORANDUM OF OPINION

MANOS, District Judge.

On August 15, 1983, plaintiffs, Albert Reiter, Otis Whitman, Tim Cole, and Donald S. Ford, filed the above-captioned case against their former employer, Midland Ross Corpo-

ration, their union, the United Steelworkers of America, and its Local 1477. On September 24, 1984, plaintiffs, Reiter, Whitman, and Louis Clyburn filed an amended complaint.[1] Plaintiffs were employees of the defendant corporation until the plant in which they worked was permanently shut down. They allege that the international union wrongfully placed the local union under trusteeship. They allege that the union[2] breached its duty of fair representation by approving the plant closing agreement and refusing to file grievances for certain benefits to which plaintiffs believed they were entitled. Plaintiffs further allege that the company breached the collective bargaining agreement by refusing to pay certain benefits. The case is before the court on a motion to file a second amended complaint and motions for summary judgment filed by the corporation and the unions. For the following reasons, the motion to file a second amended complaint is denied, and the motions for summary judgment are granted.

## I. Summary Judgment

The purpose of summary judgment is "to isolate and dispose of factually unsupported claims...." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). It protects the rights of persons opposing claims with no factual basis. *Id.* at 328, 106 S.Ct. at 2555. Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).

The party moving for summary judgment bears the initial burden of production under Rule 56. The burden may be satisfied by presenting affirmative evidence that negates an element of the non-movant's claim or by demonstrating "an absence of evidence to support the non-moving party's case." *Celotex*, 477 U.S. at 325, 106 S.Ct. at 2554.

If the movant meets this burden, the non-movant must "set forth specific facts showing that there is a genuine issue for trial." Fed. R.Civ.P. 56(e). The substantive law identifies which specific facts are material. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). To avoid summary judgment, the non-movant must "make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322, 106 S.Ct. at 2552.

"The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 256, 106 S.Ct. at 2513 (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59, 90 S.Ct. 1598, 1608–09, 26 L.Ed.2d 142 (1970)). However, the non-movant must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). "[T]he mere existence of some alleged factual disputes between the parties will not defeat an otherwise properly supported motion" for summary judgment. *Anderson*, 477 U.S. at 247–48, 106 S.Ct. at 2510.

### A. Facts

Plaintiffs are former employees of Midland Ross Corporation's National Casting Division, a steel plant in Sharon, Pennsylvania. The plant manufactured steel castings for the railroad industry. From 1981–1983, demand for this product decreased. Due to this adverse economic condition, the company layed off nearly 500 workers by April 1, 1982. (Fennessey Aff. at ¶¶ 1–6). In April of 1983, Midland Ross announced that the National Casting Division would be permanently closed on May 31, 1983. (Toth Aff. at ¶ 6).

Later the same month, the International placed Local 1477 under a trusteeship because it considered the plant shutdown to be an emergency situation requiring immediate

---

1. Cole and Ford dismissed their claims before the amended complaint was filed. (Midland's Summ.J.Mot. at 2–5).

2. In their complaint, plaintiffs refer to the "USWA" and do not differentiate between the Local and the International. Hereinafter "the union" shall be used to refer to both the Local and the International.

intervention to protect employee rights and union resources.[3] (Union's Summ.J.Mot., Ex. I). On May 12, 1983, the International notified the local that a hearing to ratify the trusteeship would be held on May 24, 1983. (Marzec Aff. at ¶ 15). The local union members were advised they would have the opportunity to present witnesses and argument on that issue. (Brief in Opp. to Union's Summ J.Mot., Ex. C.). At the hearing, international union officers answered all questions posed by union members and explained the policy of imposing a trusteeship whenever a company announces a plant shutdown. *Id.,* Ex. D. Neither side presented evidence. *Id.* After the hearing, the union's international executive board recommended continuing the trusteeship. (Toth Aff. at ¶ 16). The local was notified that on August 23, 1983, it would be given the opportunity to appeal. No appeal was taken. *Id.* at ¶ 18.

On May 5, 1983, the international union and the Company began a series of seven negotiating sessions which resulted in an agreement on the plant closing. (Toth Aff. at ¶ 2). This agreement, which superseded the collective bargaining agreement, was executed on June 30, 1983. *Id.* at ¶¶ 2, 32, 33. The agreement was the product of "intense and sometimes heated disputes." *Id.* at ¶ 3. Andrew L. Toth, the lead negotiator for the International, settled all disputes with the company by executing a plant closing agreement because "if we could not achieve a mutually acceptable package, we would have had to arbitrate every single issue involved in the plant closing negotiations with no guarantee of success." *Id.* Throughout the negotiations, Toth sought to and did maximize the benefits for the members of Local 1477. *Id.* at ¶ 4.

The first goal was to change the pension eligibility date. The company maintained that the plant closing date was the last day on which an employee could meet pension eligibility requirements. *Id.* at ¶ 6. The International sought to have this date extended even though no language in the contract afforded employees this right. *Id.* at ¶ 7. The International succeeded in extending the date five months. *Id.* at ¶ 8. As a result, the agreement improved pension benefits for fifty-five employees. *Id.* at ¶ 10.

The second goal was to assure that each employee would receive the full amount of pension benefits to which he was entitled. *Id.* at ¶ 11. At the time negotiations began, the pension fund contained approximately $3,200,000 less than the amount required to provide full pension benefits. *Id.* The terms of the pension provided that the benefits could be recovered only from the fund; therefore, the International sought to persuade the company to pay the amount owed to the fund. It succeeded in assuring that the plan was fully funded so that basic pension benefits would be paid to each eligible employee. *Id.* at ¶ 22.

> The USWA has also learned through its experience with hundreds of plant closings that the officers and members of a local union often attempt to distribute the assets of the local union's treasury to the personal benefit of the remaining members. However ... all assets of the local union must revert to the International Union. Those funds are used to process any remaining grievances and wind up affairs of the local union. Any remaining funds are held in escrow for a period of years in the event the plant reopens and the local union is reactivated....
>
> Almost all local unions of the USWA are comprised of single units rather than amalgamated units. As a result, a closing of one plant threatens the continued viability of the entire local union.
>
> (Marzec Aff. at ¶¶ 5–7).

---

3. In 1983, 141 of the 177 trusteeships were imposed because of plant shutdowns. (Marzec Aff. at ¶ 2). Donald Marzec, the USWA director who sets up trusteeships, stated that plant closings are considered emergencies for the following reasons:

> Years of experience in the USWA have shown that once a company announces a plant closing, the members including the local officers, look for other jobs. When local officers find such jobs, they are likely to abandon their union office. When that happens the members are left without local union representation until such time as special elections can be held to replace those officers. Meanwhile, other members are reluctant to run for office for the limited duration until the plant closes. Experience has shown that in such a time of crisis, time and other scarce resources are diverted from administering the collective bargaining agreement to holding an election to replace the officers.

The third goal was to extend health insurance coverage for as long as possible. *Id.* at ¶ 23. Pursuant to the collective bargaining agreement, if an employee was terminated, health insurance coverage ceased at the end of the month of termination. Because all employees were terminated on May 31, 1983, the company maintained that health insurance coverage ceased on that date. *Id.* The International persuaded the company to extend coverage for two additional months and provide a 90–day period in which each employee who had a major illness could obtain coverage by paying premiums retroactively. *Id.* at ¶ 24.

The fourth goal was to maximize severance benefits. *Id.* at ¶ 25. The collective bargaining agreement provided severance benefits for employees terminated because of a permanent plant shutdown. Article XVIII, § 18.01. The company stated that anyone laid off before December 1, 1982, was terminated for reasons of adverse economic conditions and therefore was not eligible for severance benefits. (Toth Aff. at ¶ 26). Despite court holdings which supported the company's position, the International persuaded the company to extend the eligibility date to June 1, 1982 and create a fund of $250,000 for employees laid off before June 1, 1982. *Id.* at ¶ 31.

### B. Right of Ratification

■ Counts 5 and 6 allege that the plant closing agreement is void because plaintiffs were denied the right to ratify it. There is no legal requirement that a collective bargaining agreement negotiated by the International be submitted to the union members for ratification. *Conran v. Great Atl. & Pac. Tea Co., Inc.*, 499 F.Supp. 727 (1980). Unless the International's constitution, by-laws, and rules create a right of ratification, no such requirement can be imposed. *Central States S.E. and S.W. Areas Pension Fund v. Kraftco, Inc.*, 799 F.2d 1098, 1111 (6th Cir. 1986), *cert. denied*, 479 U.S. 1086, 107 S.Ct. 1291, 94 L.Ed.2d 147 (1987).

The international constitution does not create a right of ratification. It permits local unions to "adopt, subject to approval by the International Union, such by-laws and rules as do not conflict with any of the provision of this Constitution or the policies of the International Union." Int. Const., Article VII, § 5. It does not create a right to ratification. (Union's Summ.J.Mot., Ex. A). Local 1477 adopted by-laws which set up a bargaining committee to "[n]egotiate agreements with management subject to the approval of the membership." Local 1477 By-laws, Article XXI. This article created a right of ratification for agreements negotiated by the local's bargaining committee.

■ To the extent that the local by-laws conflict with the international constitution or rules, the local by-laws are invalid. The right to ratify actions of the local bargaining committee does not create a right to ratify agreements by the International because the local does not have the power to bind the International except if authorized expressly. Therefore, the right to ratify does not apply to the plant closing agreement because it was negotiated by Andrew Toth, an international staff representative and not by the local bargaining committee.

■ Furthermore, the International, not the local, is the party which contracts with the company. Int. Const., Art. XVII, § 1. Therefore, the International is the exclusive representative of the employees, and the sole collective bargaining agent. *Local Union No. 12405, Dist. 50, United Mine Workers v. Martin Marietta Corp.*, 328 F.2d 945 (7th Cir.), *cert. denied*, 379 U.S. 880, 85 S.Ct. 147, 13 L.Ed.2d 87 (1964). Section 2.01(c) of the collective bargaining agreement provides that further agreements negotiated by Midland and the International become part of the collective bargaining agreement without ratification by the membership.

Because plaintiffs did not have the right to ratify the plant closing agreement, summary judgment is granted as to counts 5 and 6.

### C. The Trusteeship

■ In Counts 1, 2, and 3, plaintiffs charge that the imposition of the trusteeship was invalid because the International did not conduct an adequate hearing and because the trusteeship was imposed for the purposes of

denying benefits[4] and the right to ratify amendments to the collective bargaining agreement.[5]

 A trusteeship is presumed to be valid unless a plaintiff can show by clear and convincing evidence that it was not imposed in conformity with procedural requirements or was not established in good faith for a purpose allowed by statute. *Teamsters Local Union No. 406 v. Crane,* 848 F.2d 709, 712 (6th Cir.1988). A hearing is considered fair if plaintiffs were notified of the date, the nature of the hearing, and the reason for imposition of the trusteeship. Plaintiffs must also be given the opportunity to present rebuttal evidence and to cross-examine. *Jolly v. Gorman,* 428 F.2d 960 (5th Cir.1970), *cert. denied,* 400 U.S. 1023, 91 S.Ct. 588, 27 L.Ed.2d 635 (1971). Providing the opportunity for a hearing is sufficient even if union members do not take advantage of it. *International Broth. of Boilermakers v. Local Lodge D238 of the Cement, Lime, Gypsum, and Allied Workers Div. of the Intern. Broth. of Boilermakers,* 865 F.2d 1228 (11th Cir. 1989).

Plaintiffs allege that they did not receive adequate notice of the hearing. However, the local union was given twelve days to prepare and was notified that the shutdown was the sole reason for imposing the trusteeship. There was no need to present evidence on this point because on the date of the hearing, the plant had been closed for nearly a month. Nonetheless, the local union members were afforded the opportunity to attend and to be heard. At the hearing, the union members asked questions, but did not present any evidence to support their argument that the trusteeship was imposed for improper purposes. Plaintiffs do not indicate they had any evidence to present. One cannot be denied the opportunity to present evidence one does not have. At a subsequent appellate hearing, no member of the local union appeared to argue that the trusteeship was invalid. Based on these circumstances, the court finds that the trusteeship was properly imposed.

 Next, the court must examine whether the trusteeship was imposed in good faith for a purpose permitted under the statute. This court must presume that a procedurally sound trusteeship is valid unless there is evidence of bad faith or evidence of an improper purpose. *Teamsters Local Union No. 406 v. Crane,* 848 F.2d 709, 713–714 (6th Cir.1988). A trusteeship may be imposed "for the purpose of correcting corruption or financial malpractice, assuring the performance of collective bargaining agreements or other duties of a bargaining representative, restoring democratic procedures or otherwise carrying out the legitimate objects of such labor organization." 29 U.S.C. § 462.

The International has substantially supported its assertion that the trusteeship was established to protect employee rights and local union resources. Plaintiffs present nothing to indicate bad faith. Accordingly, summary judgment is granted as to counts 1, 2, and 3.

### D. Fair Representation Duty

Count 4 alleges that the union breached its duty of fair representation by entering into the plant closing agreement. Counts 8, 10, and 12 allege that the union breached its duty of fair representation by refusing to arbitrate the plaintiffs' grievances for benefits plaintiffs alleged they were entitled to pursuant to the collective bargaining agreement.

 A labor union owes a duty to fairly represent all members of the bargaining unit in disputes arising out of the labor contract. *Journeymen Pipe Fitters Local 392 v. N.L.R.B.,* 712 F.2d 225, 228 (6th Cir. 1983). In *Vaca v. Sipes,* 386 U.S. 171, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967), the Supreme Court held that this duty is breached if a union demonstrates arbitrary conduct, discrimination, or bad faith. *Id.* at 190, 87 S.Ct. at 916. The Sixth Circuit interprets *Vaca* to set forth the following standards:

4. This allegation is discussed in Section D.

5. The assertion that the union imposed the trusteeship to thwart their right to ratify collective bargaining agreements is insufficient because, as discussed in Section B, no such right existed.

First, ... [a union] must treat all factions and segments of its membership without hostility or discrimination. Next, the broad discretion of the union in asserting the rights of its individual members must be exercised in complete good faith and honesty. Finally, the union must avoid arbitrary conduct.

*Ruzicka v. General Motors Corp.*, 523 F.2d 306, 309–10 (6th Cir.1975). A union must conform to each of these standards because breaching any one of them constitutes a basis for a civil action. *Id.* An employee need not demonstrate that the union acted in bad faith. *Poole v. Budd Co.*, 706 F.2d 181, 183 (6th Cir.1983). However, ordinary negligence or mistaken judgment, without more, does not establish a breach. *Ruzicka v. General Motors Corp.*, 649 F.2d 1207, 1212 (6th Cir.1981), *cert. denied*, 464 U.S. 982, 104 S.Ct. 424, 78 L.Ed.2d 359 (1983).

■■■ The duty of fair representation applies to all union action including contract negotiation. *Air Line Pilots Association, International v. O'Neill*, 499 U.S. 65, 67–69, 111 S.Ct. 1127, 1130, 113 L.Ed.2d 51 (1991). "[A] union's actions are arbitrary only if, in light of the factual and legal landscape at the time of the unions actions, the union's behavior is so far outside a 'wide range of reasonableness,' as to be irrational." *Id.* (citation omitted). A bad settlement is not necessarily irrational. *Id.* at 78, 111 S.Ct. at 1136. "In labor disputes, even a bad settlement may be more advantageous in the long run

than a good lawsuit." *Id.* at 81, 111 S.Ct. at 1137. "Congress did not intend judicial review of a union's performance to permit the court to substitute its own view of the proper bargain for that reached by the union." *Id.* at 78, 111 S.Ct. at 1135.

■■■ The duty of fair representation also applies to the prosecution of grievances. Although a union may not arbitrarily ignore a grievance, an employee does not have an absolute right to have his grievance taken to arbitration. *Vaca*, 386 U.S. at 191, 87 S.Ct. at 917.[6]

■■■ The International negotiated a plant closing agreement which entitled the union members to more benefits than they would have obtained under the collective bargaining agreement. The plaintiffs contend that they could have obtained more if the collective bargaining agreement had been enforced. However, the International determined that the contractual language was ambiguous, and decided not to risk arbitrating claims on which it was unlikely to prevail. The evidence strongly indicates that executing the plant closing agreement was a result of diligent effort on the part of the International to agree on a settlement which would maximize employee benefits with certainty. No evidence indicates that the International's decision to execute the plant closing agreement was discriminatory, arbitrary or in bad faith. The plant closing agreement superseded the collective bargaining agreement. Therefore,

**6.** In *Vaca v. Sipes*, 386 U.S. 171, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967), the Supreme Court rejected the position that an employee has an absolute right to have his grievance taken to arbitration. It further established an employee alleging wrongful discharge may sue his employer only if he can first prove that the union breached its duty of fair representation in handling his grievance. The rationale for this procedural hurdle is that:

> In providing for a grievance and arbitration procedure which gives the union discretion to supervise the grievance machinery and to invoke arbitration, the employer and the union contemplate that each will endeavor in good faith to settle grievances short of arbitration. Through the settlement process, frivolous grievances are ended prior to the most costly and time-consuming step in the grievance procedures. Moreover, both sides are assured that similar complaints will be treated consis-

> tently, and major problem areas in the interpretation of the collective bargaining contract can be isolated and perhaps resolved. And finally, the settlement process furthers that interest of the union as statutory agent and as coauthor of the bargaining agreement....
> If the individual employee could compel arbitration of his grievance regardless of its merit, the settlement machinery provided by the contract would be substantially undermined, thus destroying the employer's confidence in the union's authority and returning the individual grievant to the vagaries of independent and unsystematic negotiation. Moreover, under such a rule, a significantly greater number of grievances would proceed to arbitration. This would greatly increase the cost of the grievance machinery and could so overburden the arbitration process as to prevent it from functioning successfully. *Id.* at 191–192, 87 S.Ct. at 917 (citation and footnote omitted).

once the closing agreement was finalized, the International could not process grievances for the alleged breach of a prior agreement.

Accordingly, the court finds that neither the International nor the local breached its duty to fairly represent the plaintiffs. Summary judgment is granted as to counts 4, 8, 10, and 12.

### E. Breach of the Collective Bargaining Agreement

 Counts 7, 9, and 11 assert that Midland breached the collective bargaining agreement. As stated above, the collective bargaining agreement authorized the International and the company to amend or modify it. The execution of the plant closing agreement cannot be construed as a breach of the collective bargaining agreement because it was executed to supersede it. Moreover, to prevail against the company for breaching the collective bargaining agreement, plaintiffs must first show that the International breached its duty to fairly represent them. *United Parcel Service, Inc. v. Mitchell,* 451 U.S. 56, 62–63, 101 S.Ct. 1559, 1563–64, 67 L.Ed.2d 732 (1981). To prove a breach of the collective-bargaining agreement, "the indispensable predicate ... is not a showing under traditional contract law [of] ... a breach of the collective-bargaining agreement, but instead a demonstration that the Union breached its duty of fair representation." *Id.* Because plaintiffs have not stated a claim for breach of the duty of fair representation, the allegations that the company breached the collective bargaining agreement are dismissed.

### II. Motion to Amend Complaint

 On September 24, 1984, plaintiffs moved for leave to file a second amended complaint. Leave to amend a complaint "shall be freely given when justice so requires." Fed.R.Civ.P. 15(a). However, if plaintiffs do not articulate facts which are a proper subject for relief, the district court may deny the motion. *See Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962); *Consumers Petroleum Co. v. Texaco, Inc.,* 804 F.2d 907 (6th Cir. 1986).

The second amended complaint presents no new facts. Plaintiffs seek to add a claim for unemployment compensation and a claim for additional benefits which were allegedly denied. Neither the union nor the employer can be responsible for the payment of unemployment compensation. The state unemployment compensation board decides whether one is eligible, and if so, when the payment shall be made. Ohio Rev.Code §§ 4141.01–4141.32; 43 Pa.Stat. § 751 et seq. A private employer has no control over this decision. The proposed amendment to add claims for more benefits would also be futile because plaintiffs have not stated claims for breach of the fair representation duty or breach of the collective bargaining agreement upon which such relief could be granted. For these reasons, the motion to amend is denied.

### III.

The motion to file a second amended complaint is denied. The motions for summary judgment are granted, and the case is dismissed.

IT IS SO ORDERED.