Ronald D. SUDDERTH, Plaintiff,

v.

ALRECO METALS, INC., and District No. 97 of the International Association of Machinists & Aerospace Workers, AFL–CIO, Defendants.

No. 4:92–CV–166.

United States District Court,
W.D. Michigan, S.D.

Oct. 7, 1993.

David P. LaForge, Burhans, LaForge & Berger, St. Joseph, MI, for plaintiff.

Gregory M. Palmer, Varnum, Riddering, Schmidt & Howlett, Grand Rapids, MI, for Alreco.

Darryl R. Cochrane, McCroskey, Feldman, Cochrane & Brock, Muskegon, MI, for District No. 97.

## MEMORANDUM OPINION

McKEAGUE, District Judge.

Plaintiff Ronald D. Sudderth filed suit against Alreco Metals, Inc. ("Alreco"), and District 97 of the International Association of Machinists and Aerospace Workers, AFL–CIO ("Union"), on December 1, 1992. His complaint alleges that he was wrongfully ter-

minated by his employer Alreco in 1991 and that the Union breached its duty to fairly represent the plaintiff when it failed to take plaintiff's grievance against Alreco to arbitration. Effectively, plaintiff's complaint constitutes a hybrid duty of fair representation claim under § 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185. Both defendants have now moved this Court for summary judgment.

## FACTS

Alreco hired plaintiff as a maintenance worker on February 13, 1990. As a maintenance worker, plaintiff was represented by the Union. The Union is an amalgamated local, comprised of employees from four other companies in the area. The local has about 200 members, of which 75 work for Alreco.

Prior to plaintiff's hire, Alreco had unilaterally issued "Guidelines for Administering Plant Conduct Rule No. 3." Effectively, the guidelines amounted to an attendance control policy. The guidelines had been the subject of an ongoing discussion between the Union and Alreco for some time, although it was clear Alreco had the authority to issue them under the collective bargaining agreement. Under the guidelines, employees were subject to discipline when they incurred a certain number of "occurrences" (unexplained absences, sick days, late arrivals, etc.). Absences stemming from work-related injuries did not count as occurrences. After twelve occurrences in one year, employees could be discharged. Workers were also subject to discipline on an individual basis outside of guideline requirements for "excessive, chronic, and habitual" absenteeism.

Plaintiff testified he was aware of Alreco's attendance policy. His attendance record for the years 1990 and 1991, however, shows repeated occurrences, absences, and disciplinary suspensions.

Approximately six months after plaintiff was hired, Alreco issued him a verbal and written warning for excessive absenteeism, pursuant to the guideline provision which allowed the employer to discipline employees for "excessive, chronic and habitual" absenteeism. Plaintiff was instructed to improve his attendance record. Over the next year, six more reprimands for absenteeism followed. Plaintiff received several disciplinary suspensions. His record did not improve. According to plaintiff, he was told repeatedly by the Union and possibly Alreco that the disciplinary suspensions "did not mean anything" and should not be taken seriously.

On October 13, 1991, plaintiff was given one last chance to correct his attendance problem. According to Alreco, plaintiff had incurred nine and one-half attendance occurrences in the preceding year. The "last chance" letter required plaintiff to incur no more than one attendance occurrence during each of the four subsequent calendar quarters (a total period of about one year). Plaintiff was warned that noncompliance with these requirements would result in immediate suspension for the purpose of termination. Plaintiff refused to acknowledge this warning. Subsequently, plaintiff violated the "last chance" letter and was terminated for "excessive, chronic and habitual absenteeism" effective December 11, 1991. Plaintiff claims that this termination was wrongful as two of the occurrences counted by the employer stemmed from work-related injuries, and were thus exempt from discipline under the attendance policy. In fact, on several occasions plaintiff was either treated by the employer's own physician or had his medical bills picked up by Alreco. He claims he had not incurred a sufficient number of occurrences under the policy to justify termination.

On or near the date plaintiff was terminated, Alreco offered to reinstate him pursuant to a proposed written Reinstatement Agreement. Under this Agreement, plaintiff was again required to incur no more than one attendance occurrence during each of the subsequent calendar quarters. The Agreement stated that it could not be used as the basis for any future grievance resolution, nor would an arbitrator have the power to modify or rescind any discharge under the Agreement. Plaintiff requested one day to think over the Agreement. He spoke to various individuals about the matter, including Kenneth Brinsfield, president of the local union. According to plaintiff, Mr. Brinsfield recom-

mended that plaintiff not sign the Agreement as it would waive plaintiff's arbitration rights, but instead file a grievance. Mr. Brinsfield was apparently aware that plaintiff was claiming that several attendance occurrences stemmed from work-related injuries. Other union officials were present during the conversation with Mr. Brinsfield and apparently concurred in this advice.

Plaintiff ultimately rejected the offer of reinstatement. According to his brief, he did so in reliance on the Union's promise it would arbitrate his grievance. At his deposition, however, he indicated that the only reason he decided not to sign the Agreement was because "it was a violation of my constitutional rights, I thought."

Plaintiff filed two grievances with the Union protesting these actions by Alreco. Grievance No. 91–51, filed October 21, 1991, protested the "last chance" letter plaintiff received on October 13, 1991. On February 21, 1992, plaintiff filed Grievance No. 91–53, protesting his December 11, 1991, discharge and the fairness of the attendance guidelines which led to plaintiff's termination. Alreco and the Union processed both grievances through each of the grievance steps short of arbitration.

Plaintiff's claim that the Union breached its duty to fairly represent him under § 301 of the LMRA is based solely upon the Union's refusal to arbitrate the second grievance, No. 91–53. The Union's Business Manager, Jim Morris, charged with processing the plaintiff's grievance, first learned of the claim in January of 1992. Mr. Morris met with plaintiff several times and Alreco management once to resolve the claim pursuant to the grievance process. He requested a copy of plaintiff's attendance record from Alreco and found it to be "lengthy." At one meeting with plaintiff, plaintiff informed Mr. Morris that several of the occurrences were medically related and that he possessed documentation which showed that the absences should have been excused. Mr. Morris did not request that plaintiff produce this documentation. The Union contends that Mr. Morris was fully aware that plaintiff could substantiate his claim of work-related injuries. Mr. Morris' affidavit contradicts this

assertion, however. According to Mr. Morris, "My investigation showed that none of the occurrences [plaintiff] received were because of an industrial injury or sickness." Mr. Morris does not elaborate on what his investigation entailed.

In late February, 1992, Alreco offered to reinstate plaintiff under the terms of its December offer. Plaintiff again declined.

On May 8, 1992, Alreco proposed to resolve 91–53 with a Memorandum of Agreement which would reinstate plaintiff to his former position, provided his attendance improved. This Agreement was essentially the same as that offered to plaintiff in December of 1991. Plaintiff chose not to accept the offer of reinstatement and refused to sign the Agreement. On June 4, 1992, the Union requested arbitration on Grievance No. 91–53. Arbitrators were requested from the Federal Mediation and Conciliation Service a short time later.

During this period, Alreco and the Union were embroiled in arbitration over the termination of Eddie Davis. Davis had accumulated a poor attendance record over several years, but had incurred only eight occurrences in the year preceding his termination, four short of the twelve occurrences needed for termination under the standard guidelines. Alreco thus had terminated Davis under the guideline section which addressed "excessive, chronic, and habitual" absenteeism. The Union opposed the termination, arguing that the "excessive, chronic, and habitual" provision was being applied capriciously and arbitrarily by Alreco, providing employees with no standard to which to conform their conduct.

The arbitrator in the Davis case examined whether Alreco could deviate from the guidelines under the "chronic" provision, and, if so, whether Alreco had just cause to fire Davis under that section. The arbitrator found that Alreco did in fact have just cause to deviate from the guidelines under the "chronic" provision and discipline Davis. Given the circumstances of the case and Davis' refusal to explain the reasons for his absences until the arbitration hearing, the arbitrator found that the termination was justified.

Due to the loss in the Davis arbitration, Mr. Morris sought input from the union membership on plaintiff's claim. Plaintiff's grievance was put to a vote by the local union at the August 1992 meeting. Plaintiff was unaware of this meeting. Union leaders informed the local immediately prior to the vote that they didn't think they could win plaintiff's grievance, and that it could prove to be a waste of money and time. Mr. Morris told the membership that plaintiff's case was "very similar" to the Davis arbitration. Plaintiff claims that the August meeting which determined the fate of his grievance was dominated by Union officials who had clashed with plaintiff in the past over political and personal issues. The ultimate Union vote was 26 to 2 against taking the plaintiff's grievance to arbitration. Plaintiff contends that these numbers do not reflect the actual tally of votes, as he purports to know of four individuals who supported his case. At the August meeting, two other attendance-related grievances were voted down.

It is unclear who had the ultimate authority to pursue plaintiff's grievance. According to the Union, the vote was not necessary before the Union could take action. Mr. Morris had final authority on whether the Union should move forward on plaintiff's claim. Mr. Morris testified he had the vote taken to gauge membership interest in pursuing this grievance, given that the Union had just lost the Davis grievance. Based partly on the results of this vote, Mr. Morris decided that the Union would not pursue plaintiff's grievance. Plaintiff disagrees, claiming that the Union informed him that the ultimate decision was in the hands of the Union membership. Thus, the decision to drop plaintiff's grievance was controlled by the vote, plaintiff claims, not an independent judgment by Mr. Morris.

Plaintiff contends that the Union's decision to drop his grievance was based on inadequate investigation and personal dislike of him by Union members. He contends that the Union seriously erred in failing to discover that his absences stemmed from work-related injuries, and thus should not have constituted grounds for termination. His claim differed substantially from the Davis grievance, he maintains. He believes that the ultimate decision by the Union to ignore his medical evidence and drop the claim stemmed from political conflicts and disagreements he had with Union leadership.

Subsequent to the Union's decision to drop plaintiff's grievance, the Union and Alreco made another attempt to settle the dispute. They tentatively agreed to reinstate plaintiff by converting his termination to a disciplinary layoff and placing him on a recall list. Two other employees who were also terminated for chronic absenteeism were offered the same deal. These employees accepted the offer, but plaintiff rejected it. This action followed.

## DISCUSSION

Defendants Alreco and the Union have now moved this Court for summary judgment pursuant to Fed.R.Civ.P. 56. Summary judgment is appropriate when the record reveals that there are no issues as to any material fact in dispute and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Sims v. Memphis Processors, Inc.*, 926 F.2d 524, 526 (6th Cir.1991) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986), and *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986)). The standard for determining whether summary judgment is appropriate is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *See Booker v. Brown & Williamson Tobacco Co.*, 879 F.2d 1304, 1310 (6th Cir. 1989) (quoting *Anderson*, 477 U.S. at 251–52, 106 S.Ct. at 2512). "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson*, 477 U.S. at 247–48, 106 S.Ct. at 2510 (emphasis in original).

The moving party bears the burden of clearly and convincingly demonstrating the

absence of any genuine issues of material facts. *Sims,* 926 F.2d at 526. The court must consider all pleadings, depositions, affidavits, and admissions on file and draw all justifiable inferences in favor of the party opposing the motion. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). If the moving party carries this burden, the nonmoving party must present significant probative evidence showing that genuine, material factual disputes remain to defeat summary judgment. *Sims,* 926 F.2d at 526. The court's function is not to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial. *Id.* The court must make purely legal judgments that go to the nature and sufficiency of the complaint as well as the evidence put forward to support it. *Val–Land Farms, Inc. v. Third Nat'l Bank,* 937 F.2d 1110, 1113 (6th Cir.1991). Applying these principles to the present case, the Court concludes that both defendants' motions for summary judgment should be granted.

■ To survive a motion for summary judgment in a hybrid § 301 claim under the LMRA, the plaintiff must show "that the employer's action violated the terms of the collective-bargaining agreement and that the union breached its duty of fair representation." *Chauffeurs Teamsters & Helpers, Local No. 391 v. Terry,* 494 U.S. 558, 563–64, 110 S.Ct. 1339, 1344, 108 L.Ed.2d 519 (1990). The burden of proof lies with the plaintiff to prove both of these elements. *See Del Costello v. International Brotherhood of Teamsters,* 462 U.S. 151, 165, 103 S.Ct. 2281, 2291, 76 L.Ed.2d 476 (1983). It is not enough that the plaintiff prove only that one of the defendants breached its duty or violated a contractual obligation. "Unless [plaintiff] demonstrates *both* violations, he cannot succeed against either party." *Bagsby v. Lewis Bros. Inc. of Tenn.,* 820 F.2d 799, 801 (6th Cir. 1987) (emphasis added).

■ The plaintiff must first establish that the union breached its duty of fair representation before this Court may consider evidence of the employer's breach of the bargaining agreement. *See United Parcel Service, Inc. v. Mitchell,* 451 U.S. 56, 62, 101 S.Ct. 1559, 1564, 67 L.Ed.2d 732 (1981). Accordingly, the Court's first task is to determine whether the Union breached its duty to the plaintiff.

## I. Union's Duty of Fair Representation

■ A violation of the duty of fair representation arises when a union's conduct is "arbitrary, discriminatory, or in bad faith." *Air Line Pilots Ass'n v. O'Neill,* 499 U.S. 65, 67–68, 111 S.Ct. 1127, 1130, 113 L.Ed.2d 51 (1991) (quoting *Vaca v. Sipes,* 386 U.S. 171, 190, 87 S.Ct. 903, 916, 17 L.Ed.2d 842 (1967)). Plaintiff contends that the Union acted arbitrarily, discriminatorily, and in bad faith in three separate instances: (1) when Union leadership instructed plaintiff not to sign the Reinstatement Agreement in December of 1991 and assured him they would pursue any subsequent grievance filed by plaintiff; (2) when the Union failed to adequately investigate plaintiff's case after he had filed the grievance; and (3) when the Union decided to drop plaintiff's grievance due to personal animosity and political antagonism between plaintiff and certain Union members and a general lack of knowledge about plaintiff's case.

A union's actions are arbitrary only if they are "so far outside a 'wide range of reasonableness' as to be irrational." *Air Line Pilots,* 499 U.S. at 67, 111 S.Ct. at 1130 (quoting *Ford Motor Co. v. Huffman,* 345 U.S. 330, 338, 73 S.Ct. 681, 97 L.Ed. 1048 (1953)). Mere negligence or mistaken judgment by a union with respect to evaluating a grievance is insufficient to establish a breach of a union's duty of fair representation. *Poole v. Budd Co.,* 706 F.2d 181, 183 (6th Cir.1983); *see Ruzicka v. General Motors Corp.,* 649 F.2d 1207, 1212 (6th Cir.1981). Thus, to the extent that plaintiff claims only negligence by the Union in investigating his grievance, he fails to state a viable claim. Such conduct does not rise to the level of irrationality necessary under *Air Line Pilots* to violate the duty of fair representation.

■ Plaintiff's brief relies heavily on cases which found a breach of the duty where the union acted in a "perfunctory" manner.

See, e.g., *Milstead v. International Bhd. of Teamsters, Local No. 957,* 580 F.2d 232 (6th Cir.1978) (union violated duty by failing to know of contractual provision with direct relevance to arbitration); *Donahue v. L.C.L. Transit Co.,* 492 F.Supp. 288 (W.D.Wisc.1980) (breach may arise where union fails to fully investigate). These cases, however, do not demonstrate that mere negligence or ineptness by the union is enough to establish a breach. Recently in *Poole,* the Sixth Circuit focused on what constitutes perfunctory conduct sufficient to yield a breach of the duty of fair representation. The court subsumed that discussion into the larger question of whether the union acted in an arbitrary manner. "A union's conduct may be sufficiently arbitrary to establish a breach of its duty to fairly represent its members when it handles a grievance in a 'perfunctory' manner, *with caprice or without rational explanation." Poole,* 706 F.2d at 183 (emphasis added). As used by the Sixth Circuit then, "perfunctory" is essentially synonymous with "arbitrary." *See, e.g., Sparks v. International Union, United Automobile Aerospace & Agricultural Implement Workers,* 980 F.2d 394, 398 (6th Cir.1992); *Perry v. Million Air,* 943 F.2d 616, 621 (6th Cir.1991) (Ryan, J., dissenting). Irrationality is still necessary before the plaintiff can demonstrate that the Union breached its duty of fair representation. Negligence in investigation is simply not enough to establish a claim under § 301 of the LMRA.

■ Plaintiff's brief, however, sets forth more than just mere negligence. Plaintiff maintains that he informed Mr. Morris that he possessed medical documentation which would support his claim that two of the occurrences stemmed from work-related injuries. Mr. Morris never asked to examine the documents, however. This failure by Mr. Morris, in the face of a clear indication that plaintiff might have a legitimate grievance, suggests unfairness in the Union's treatment of plaintiff's case. Inconsistent statements from the Union only buttress this conclusion. In its brief in support of the motion for summary judgment, the Union states that Mr. Morris knew full well that plaintiff could substantiate his claim of work-related injury. Mr. Morris' affidavit, however, indicates that

he investigated plaintiff's grievance and determined that none of the occurrences stemmed from on-the-job injuries. What this "investigation" entailed or how Mr. Morris accomplished it without examining plaintiff's proffered evidence is not discussed. Apparently, the only information Mr. Morris ever requested was the employer's attendance record on plaintiff. These inconsistencies in the Union's story provide strong support for plaintiff's claim that the failure to fully investigate his claim, and the conclusion that his grievance was "very similar" to the Davis arbitration, were motivated by improper considerations.

■ Plaintiff's contention that the Union vote to drop his grievance was motivated by political antagonism further indicates unfairness by the Union. According to the briefs, the Union vote taken in August 1992 was a motivating factor, if not the conclusive factor, in the decision to drop plaintiff's grievance short of arbitration. Plaintiff has produced evidence in the form of affidavit testimony which indicates that the vote may have been influenced by plaintiff's political allegiances within the Union and personal conflicts with certain members. Such evidence raises the specter that the Union may have acted irrationally, in bad faith, or in a discriminatory fashion in deciding to drop plaintiff's grievance. The use of "forbidden grounds," such as an employee's position on the Union and its leaders, in reaching a decision to process a grievance, "creates a legitimate claim of 'unfair' representation." *Thomas v. United Parcel Serv., Inc.,* 890 F.2d 909, 923 (7th Cir.1989) (quoting *Antrim v. Burlington Northern, Inc.,* 847 F.2d 375, 378 (7th Cir. 1988), *cert. denied,* 488 U.S. 891, 109 S.Ct. 226, 102 L.Ed.2d 216 (1988)).

Analyzing all the evidence in the light most favorable to plaintiff, the Union has failed to demonstrate that there remains no material issue of fact as to whether it acted arbitrarily, discriminatorily, or in bad faith. Plaintiff has produced sufficient evidence to suggest the Union may have breached its duty to plaintiff.

## II. Alreco's Duty Not to Violate the Collective Bargaining Agreement

■ Once the Court has determined whether plaintiff's claim survives the Union's motion for summary judgment, it may next consider whether plaintiff has established that the employer violated the collective-bargaining agreement. In the present case, there appears to be no factual dispute concerning this issue which warrants trial.

Plaintiff's breach of contract claim against Alreco revolves around two assertions. First, plaintiff alleges that Alreco violated its own attendance guidelines when it discharged plaintiff. Plaintiff argues that several attendance occurrences stemmed from work-related injuries, and thus should not have been considered when Alreco management made the decision to terminate plaintiff. Under the guidelines, absences stemming from on-the-job injuries do not count for discipline purposes. However, as Alreco notes, the guidelines permitted the employer to address "chronic and habitual" absenteeism on an individual basis outside of guideline requirements. This "chronic" provision contained no restriction that prevented Alreco from looking at absences due to work-related injuries when disciplining workers. Plaintiff was terminated pursuant to this provision.

Plaintiff argues that despite the fact he was fired under the "chronic" provision and not the general guidelines, it was still improper for Alreco to consider his work-related absences when disciplining him.[1] Plaintiff appears to suggest that the guideline statement that occurrences due to on-the-job injuries do not count for discipline purposes applies even when action is taken pursuant to the "chronic" provision. Even assuming Alreco was required to discount the two disputed occurrences, however, by plaintiff's own admission he still had seven and one-half occurrences. Although this number falls far short of the twelve needed for termination under the standard guidelines, there is no such limitation under the "chronic" provision.

Plaintiff's attendance record does reveal that he incurred numerous absences during his nearly two years with Alreco. There is no indication, nor does plaintiff attempt to allege, that Alreco violated the provision of the guidelines which permits the employer to discipline workers for "excessive, chronic, and habitual" absenteeism.

■ Plaintiff's second basis for his breach of contract claim is that the guidelines themselves are objectionable, as not part of the collective bargaining agreement. Under the bargaining agreement itself, however, the guidelines are permitted. The Union itself does not contest the validity of the guidelines under the present agreement.

■ Plaintiff has failed to sufficiently allege or introduce evidence indicating that Alreco breached the collective bargaining agreement. Alreco has thus met its burden of demonstrating that no material issue of fact remains warranting a trial. As any action under § 301 of the LMRA requires both a showing that the Union breached its duty of fair representation *and* that the employer violated the collective bargaining agreement, plaintiff has failed to establish his claim. Accordingly, defendants' motions for summary judgment are **GRANTED**.

---

1. Plaintiff did not inform Alreco of the work-related nature of the two disputed occurrences during the pendency of the disciplinary proceedings. Alreco may have had knowledge of the work-related nature of the injuries as it paid some of plaintiff's medical bills and had its own physician treat plaintiff, but there is no evidence that plaintiff brought this fact home to Alreco during the course of the disciplinary conferences between Alreco and plaintiff.