# AIR LINE PILOTS ASSOCIATION, INTERNATIONAL
## *v.* O'NEILL ET AL.

No. 89–1493.   Argued January 14, 1991—Decided March 19, 1991

STEVENS, J., delivered the opinion for a unanimous Court.

*Laurence Gold* argued the cause for petitioner. With him on the briefs were *Harold G. Levison, Jed S. Rakoff, David Silberman, Gary Green,* and *John A. Irvine.*

*Marty Harper* argued the cause for respondents. With him on the brief were *John P. Frank, Allen R. Clarke,* and *Janet Napolitano.*\*

JUSTICE STEVENS delivered the opinion of the Court.

We granted certiorari to clarify the standard that governs a claim that a union has breached its duty of fair representation in its negotiation of a back-to-work agreement terminating a strike. We hold that the rule announced in *Vaca* v. *Sipes,* 386 U. S. 171, 190 (1967)—that a union breaches its duty of fair representation if its actions are either "arbitrary, discriminatory, or in bad faith"—applies to all union activity, including contract negotiation. We further hold that a union's actions are arbitrary only if, in light of the factual and legal landscape at the time of the union's actions, the union's behavior is so far outside a "wide range of reasonableness," *Ford Motor Co.* v. *Huffman,* 345 U. S. 330, 338 (1953), as to be irrational.

---

\*Briefs of *amici curiae* urging reversal were filed for the United States by *Solicitor General Starr, Assistant Attorney General Gerson, Deputy Solicitor General Shapiro,* and *James A. Feldman;* and for Continental Airlines, Inc., by *John J. Gallagher* and *Charles L. Warren.*

## I

This case arose out of a bitter confrontation between Continental Airlines, Inc. (Continental), and the union representing its pilots, the Air Line Pilots Association, International (ALPA). On September 24, 1983, Continental filed a petition for reorganization under Chapter 11 of the Bankruptcy Code. Immediately thereafter, with the approval of the Bankruptcy Court, Continental repudiated its collective-bargaining agreement with ALPA and unilaterally reduced its pilots' salaries and benefits by more than half. ALPA responded by calling a strike that lasted for over two years. See 886 F. 2d 1438, 1440 (CA5 1989).

Of the approximately 2,000 pilots employed by Continental, all but about 200 supported the strike. By the time the strike ended, about 400 strikers had "crossed over" and been accepted for reemployment in order of reapplication. App. to Brief for Continental Airlines, Inc., as *Amicus Curiae* A11, and n. 8. By trimming its operations and hiring about 1,000 replacements, Continental was able to continue in business. By August 1985, there were 1,600 working pilots and only 1,000 strikers. 886 F. 2d, at 1440.

The strike was acrimonious, punctuated by incidents of violence and the filing of a variety of lawsuits, charges, and countercharges. In August 1985, Continental notified ALPA that it was withdrawing recognition of ALPA as the collective-bargaining agent for its pilots. ALPA responded with a federal lawsuit alleging that Continental was unlawfully refusing to continue negotiations for a new collective-bargaining agreement. In this adversary context, on September 9, 1985, Continental posted its "Supplementary Base Vacancy Bid 1985–5" (85–5 bid)—an act that precipitated not only an end to the strike, but also the litigation that is now before us. *Ibid.*

For many years Continental had used a "system bid" procedure for assigning pilots to new positions. Bids were typi-

cally posted well in advance in order to allow time for necessary training without interfering with current service. When a group of vacancies was posted, any pilot could submit a bid specifying his or her preferred position (captain, first officer, or second officer), base of operations, and aircraft type. *Ibid.* In the past, vacant positions had been awarded on the basis of seniority, determined by the date the pilot first flew for Continental. The 85–5 bid covered an unusually large number of anticipated vacancies—441 future captain and first officer positions and an undetermined number of second officer vacancies. Pilots were given nine days— until September 18, 1985—to submit their bids. *Id.*, at 1441.

Fearing that this bid might effectively lock the striking pilots out of jobs for the indefinite future, ALPA authorized the strikers to submit bids. Several hundred did so, as did several hundred working pilots. Although Continental initially accepted bids from both groups, it soon became concerned about the bona fides of the striking pilots' offers to return to work at a future date. It therefore challenged the strikers' bids in court and announced that all of the 85–5 bid positions had been awarded to working pilots. *Ibid.*

At this juncture, ALPA intensified its negotiations for a complete settlement. ALPA's negotiating committee and Continental reached an agreement, which was entered as an order by the Bankruptcy Court on October 31, 1985. See App. 7–41. The agreement provided for an end to the strike, the disposition of all pending litigation, and reallocation of the positions covered by the 85–5 bid. See *id.*, at 10–34.

The agreement offered the striking pilots three options. Under the first, pilots who settled all outstanding claims with Continental were eligible to participate in the allocation of the 85–5 bid positions. Under the second option, pilots who elected not to return to work received severance pay of $4,000 per year of service (or $2,000 if they had been fur-

loughed before the strike began).[1]   Under the third option, striking pilots retained their individual claims against Continental and were eligible to return to work only after all the first option pilots had been reinstated.   See 886 F. 2d., at 1441–1442.

Pilots who chose the first option were thus entitled to some of the 85–5 bid positions that, according to Continental, had previously been awarded to working pilots.   The first 100 captain positions were allocated to working pilots and the next 70 captain positions were awarded, in order of seniority, to returning strikers who chose option one.   App. 13. Thereafter, striking and nonstriking pilots were eligible for captain positions on a 1-to-1 ratio.   *Id.*, at 13–14.   The initial base and aircraft type for a returning striker was assigned by Continental, but the assignments for working pilots were determined by their bids.   886 F. 2d, at 1441.   After the initial assignment, future changes in bases and equipment were determined by seniority, and striking pilots who were in active service when the strike began received seniority credit for the period of the strike.   See App. 22.

## II

Several months after the settlement, respondents, as representatives of a class of former striking pilots, brought this action against ALPA.   See App. 1.   In addition to raising other charges not before us, respondents alleged that the union had breached its duty of fair representation in negotiating and accepting the settlement.[2]   After extensive discov-

---

[1] In its *amicus curiae* brief, Continental states that the 366 pilots who elected option two received $17.3 million, an average of over $47,000 per pilot.   See Brief for Continental Airlines, Inc., as *Amicus Curiae* 9.

[2] The complaint included four counts: breach of the duty of fair representation, violation of the Labor-Management Reporting and Disclosure Act of 1959 (LMRDA), 29 U. S. C. § 411 *et seq.*, breach of fiduciary duty in violation of the LMRDA, and breach of contract.   See App. 47–56.   The District Court granted summary judgment for petitioner on all counts, *id.*, at 72–77, but respondents appealed only on the first two counts, see 886 F. 2d

ery, ALPA filed a motion for summary judgment.  See *id.*, at 3.  Opposing that motion, respondents identified four alleged breaches of duty, including the claim that "ALPA negotiated an agreement that arbitrarily discriminated against striking pilots."[3]

The District Court granted the motion, relying alternatively on the fact that the Bankruptcy Court had approved the settlement and on its own finding that, even if the October 31 settlement was merely a private agreement, ALPA did not breach its duty of fair representation.  In his oral explanation of his ruling, the District Judge opined that "the agreement that was achieved looks atrocious in retrospect, but it is not a breach of fiduciary duty badly to settle the strike."  App. 75.

The Court of Appeals reversed.  886 F. 2d 1438 (CA5 1989).  It first rejected ALPA's argument that a union cannot breach its duty of fair representation without intentional misconduct.  The court held that the duty includes "'three distinct'" components.  *Id.*, at 1444 (quoting *Tedford* v. *Peabody Coal Co.*, 533 F. 2d 952, 957, n. 6 (CA5 1976)).  A union breaches the duty if its conduct is "'arbitrary, discriminatory, or in bad faith.'"  886 F. 2d, at 1444 (quoting *Vaca* v. *Sipes*, 386 U. S., at 190).  With respect to the arbitrariness

---

1438, 1442 (CA5 1989).  The Court of Appeals affirmed the summary judgment on the LMRDA count, *id.*, at 1448, and respondents did not seek our review of this decision.  Therefore, only the fair representation claim is before us.

[3] The Court of Appeals described respondents' claims as follows:

"The O'Neill Group asserted that the duty of fair representation had been breached by ALPA and various ALPA officers because (1) ALPA failed to allow ratification of the agreement and misrepresented the facts surrounding the negotiations to avoid a ratification vote; (2) ALPA negotiated an agreement that arbitrarily discriminated against striking pilots, including the O'Neill Group; (3) ALPA and various ALPA officers misrepresented to retired and resigned pilots that they would be included in any settlement; and (4) defendants were compelled by motives of personal gain, namely self-interest and political motivations." *Id.*, at 1442.

component, the Court of Appeals followed Fifth Circuit precedent, stating:

> "'We think a decision to be non-arbitrary must be (1) based upon relevant, permissible union factors which excludes the possibility of it being based upon motivations such as personal animosity or political favoritism; (2) *a rational result of the consideration of these factors;* and (3) inclusive of a fair and impartial consideration of the interests of all employees.'" 886 F. 2d, at 1444 (quoting *Tedford,* 533 F. 2d, at 957) (footnotes omitted and emphasis added by the Court of Appeals).

Applying this arbitrariness test to the facts of this case, the Court of Appeals concluded that a jury could find that ALPA acted arbitrarily because the jury could find that the settlement "left the striking pilots worse off in a number of respects than complete surrender to [Continental]." 886 F. 2d, at 1445. That conclusion rested on the court's opinion that the evidence suggested that, if ALPA had simply surrendered and made an unconditional offer to return to work, the strikers would have been entitled to complete priority on all the positions covered by the 85–5 bid.[4] Relying on a District Court decision in litigation between ALPA and another airline,[5] the court rejected ALPA's argument that the 85–5 bid positions were arguably not vacancies because they had already been assigned to working pilots. *Id.,* at 1446. In addition, the Court of Appeals ruled that the evidence raised

---

[4] "Accepting the pilots' evidence as true as we are required to do, a jury could reasonably conclude that if ALPA had unconditionally offered to return the pilots to duty, [Continental] likely would have returned striking pilots to work according to seniority, and would have permitted strikers to bid for vacancies according to [Continental]'s seniority-based assignment procedures." *Id.,* at 1446.

[5] *Air Line Pilots Assn. Int'l v. United Air Lines, Inc.,* 614 F. Supp. 1020 (ND Ill. 1985), aff'd in relevant part, *Air Line Pilots Assn., Int'l v. United Air Lines, Inc.,* 802 F. 2d 886 (CA7 1986), cert. denied, 480 U. S. 946 (1987).

a genuine issue of material fact whether the favored treatment of working pilots in the allocation of 85–5 bid positions constituted discrimination against those pilots who had chosen to strike. *Id.*, at 1446–1447.

The court held that respondents had raised a jury question whether ALPA had violated its duty to refrain from "arbitrary" conduct, and the court therefore remanded the case for trial. *Id.*, at 1448–1449. Because it reversed the District Court's grant of summary judgment on the arbitrariness component, the Court of Appeals did not decide whether summary judgment on the fair representation claim might be precluded by the existence of other issues of fact.[6]

We granted certiorari to review the Court of Appeals' statement of the standard governing an alleged breach of a union's duty of fair representation and the court's application of the standard in this case. 498 U. S. 806 (1990).

## III

ALPA's central argument is that the duty of fair representation requires only that a union act in good faith and treat its members equally and in a nondiscriminatory fashion. The duty, the union argues, does not impose any obligation to provide *adequate* representation. The District Court found that there was no evidence that ALPA acted other than in good faith and without discrimination.[7] Because of its view of the limited scope of the duty, ALPA contends that the Dis-

---

[6] Respondents also argued that a jury could find that ALPA acted in bad faith. See n. 3, *supra.* Although we conclude below that the Court of Appeals erred in reversing summary judgment on the arbitrariness component, see Part IV, *infra,* we express no opinion on whether respondents have put forth a triable issue concerning whether ALPA acted in bad faith.

[7] "There is nothing to indicate that the Union made any choices among the Union members or the strikers who were not Union members other than on the best deal that the Union thought it could construct; that the deal is somewhat less than not particularly satisfactory is not relevant to the issue of fair representation." App. 74.

trict Court's finding, which the Court of Appeals did not question, is sufficient to support summary judgment.

The union maintains, not without some merit, that its view that courts are not authorized to review the rationality of good-faith, nondiscriminatory union decisions is consonant with federal labor policy. The Government has generally regulated only "the *process* of collective bargaining," *H. K. Porter Co.* v. *NLRB*, 397 U. S. 99, 102 (1970) (emphasis added), but relied on private negotiation between the parties to establish "their own charter for the ordering of industrial relations," *Teamsters* v. *Oliver*, 358 U. S. 283, 295 (1959). As we stated in *NLRB* v. *Insurance Agents*, 361 U. S. 477, 488 (1960), Congress "intended that the parties should have wide latitude in their negotiations, unrestricted by any governmental power to regulate the substantive solution of their differences." See also *Carbon Fuel Co.* v. *Mine Workers*, 444 U. S. 212, 219 (1979).

There is, however, a critical difference between governmental modification of the terms of a private agreement and an examination of those terms in search for evidence that a union did not fairly and adequately represent its constituency. Our decisions have long recognized that the need for such an examination proceeds directly from the union's statutory role as exclusive bargaining agent. "[T]he exercise of a granted power to act in behalf of others involves the assumption toward them of a duty to exercise the power in their interest and behalf." *Steele* v. *Louisville & Nashville R. Co.*, 323 U. S. 192, 202 (1944).

The duty of fair representation is thus akin to the duty owed by other fiduciaries to their beneficiaries. For example, some Members of the Court have analogized the duty a union owes to the employees it represents to the duty a trustee owes to trust beneficiaries. See *Teamsters* v. *Terry*, 494 U. S. 558, 567–568 (1990); *id.*, at 584–588 (KENNEDY, J., dissenting). Others have likened the relationship between union and employee to that between attorney and client.

See *id.*, at 582 (STEVENS, J., concurring in part and concurring in judgment). The fair representation duty also parallels the responsibilities of corporate officers and directors toward shareholders. Just as these fiduciaries owe their beneficiaries a duty of care as well as a duty of loyalty, a union owes employees a duty to represent them adequately as well as honestly and in good faith. See, *e. g.*, Restatement (Second) of Trusts § 174 (1959) (trustee's duty of care); *Strickland* v. *Washington*, 466 U. S. 668, 686 (1984) (lawyer must render "adequate legal assistance"); *Hanson Trust PLC* v. *ML SCM Acquisition Inc.*, 781 F. 2d 264, 274 (CA2 1986) (directors owe duty of care as well as loyalty).

ALPA suggests that a union need owe no enforceable duty of adequate representation because employees are protected from inadequate representation by the union political process. ALPA argues, as has the Seventh Circuit, that employees "do not need . . . protection against representation that is inept but not invidious" because if a "union does an incompetent job . . . its members can vote in new officers who will do a better job or they can vote in another union." *Dober* v. *Roadway Express, Inc.*, 707 F. 2d 292, 295 (CA7 1983). In *Steele*, the case in which we first recognized the duty of fair representation, we also analogized a union's role to that of a legislature. See 323 U. S., at 198. Even legislatures, however, are subject to *some* judicial review of the rationality of their actions. See, *e. g.*, *United States* v. *Carolene Products Co.*, 304 U. S. 144 (1938); *Department of Agriculture* v. *Moreno*, 413 U. S. 528 (1973).

ALPA relies heavily on language in *Ford Motor Co.* v. *Huffman*, 345 U. S. 330 (1953), which, according to the union, suggests that no review of the substantive terms of a settlement between labor and management is permissible. In particular, ALPA stresses our comment in the case that "[a] wide range of reasonableness must be allowed a statutory bargaining representative in serving the unit it represents, subject always to complete good faith and honesty of

purpose in the exercise of its discretion." *Id.*, at 338. Unlike ALPA, we do not read this passage to limit review of a union's actions to "good faith and honesty of purpose," but rather to recognize that a union's conduct must also be within "[a] wide range of reasonableness."

Although there is admittedly some variation in the way in which our opinions have described the unions' duty of fair representation, we have repeatedly identified three components of the duty, including a prohibition against "arbitrary" conduct. Writing for the Court in the leading case in this area of the law, JUSTICE WHITE explained:

> "The statutory duty of fair representation was developed over 20 years ago in a series of cases involving alleged racial discrimination by unions certified as exclusive bargaining representatives under the Railway Labor Act, see *Steele* v. *Louisville & N. R. Co.*, 323 U. S. 192; *Tunstall* v. *Brotherhood of Locomotive Firemen*, 323 U. S. 210, and was soon extended to unions certified under the N. L. R. A., see *Ford Motor Co.* v. *Huffman*, *supra.* Under this doctrine, the exclusive agent's statutory authority to represent all members of a designated unit includes a statutory obligation to serve the interests of all members without hostility or discrimination toward any, to exercise its discretion with complete good faith and honesty, and to avoid arbitrary conduct. *Humphrey* v. *Moore*, 375 U. S., at 342. It is obvious that Owens' complaint alleged a breach by the Union of a duty grounded in federal statutes, and that federal law therefore governs his cause of action." *Vaca* v. *Sipes*, 386 U. S., at 177.

This description of the "duty grounded in federal statutes" has been accepted without question by Congress and in a line of our decisions spanning almost a quarter of a century.[8]

---

[8] See, *e. g.*, *Teamsters* v. *Terry*, 494 U. S. 558, 563 (1990); *Electrical Workers* v. *Foust*, 442 U. S. 42, 47 (1979); *Hines* v. *Anchor Motor Freight, Inc.*, 424 U. S. 554, 564 (1976).

The union correctly points out, however, that virtually all of those cases can be distinguished because they involved contract administration or enforcement rather than contract negotiation. ALPA argues that the policy against substantive review of contract terms applies directly only in the negotiation area. Although this is a possible basis for distinction, none of our opinions has suggested that the duty is governed by a double standard. Indeed, we have repeatedly noted that the *Vaca* v. *Sipes* standard applies to "challenges leveled not only at a union's contract administration and enforcement efforts but at its negotiation activities as well." *Communications Workers* v. *Beck*, 487 U. S. 735, 743 (1988) (internal citation omitted); see also *Electrical Workers* v. *Foust*, 442 U. S. 42, 47 (1979); *Vaca* v. *Sipes*, 386 U. S., at 177. We have also held that the duty applies in other instances in which a union is acting in its representative role, such as when the union operates a hiring hall. See *Breininger* v. *Sheet Metal Workers*, 493 U. S. 67, 87–89 (1989).

We doubt, moreover, that a bright line could be drawn between contract administration and contract negotiation. Industrial grievances may precipitate settlement negotiations leading to contract amendments, and some strikes and strike settlement agreements may focus entirely on questions of contract interpretation. See *Conley* v. *Gibson*, 355 U. S. 41, 46 (1957); *Steelworkers* v. *Warrior & Gulf Navigation Co.*, 363 U. S. 574, 581 (1960). Finally, some union activities subject to the duty of fair representation fall into neither category. See *Breininger*, 493 U. S., at 87–89.

We are, therefore, satisfied that the Court of Appeals correctly concluded that the tripartite standard announced in *Vaca* v. *Sipes* applies to a union in its negotiating capacity. We are persuaded, however, that the Court of Appeals' further refinement of the arbitrariness component of the standard authorizes more judicial review of the substance of negotiated agreements than is consistent with national labor policy.

As we acknowledged above, Congress did not intend judicial review of a union's performance to permit the court to substitute its own view of the proper bargain for that reached by the union. Rather, Congress envisioned the relationship between the courts and labor unions as similar to that between the courts and the legislature. Any substantive examination of a union's performance, therefore, must be highly deferential, recognizing the wide latitude that negotiators need for the effective performance of their bargaining responsibilities. Cf. *Day-Brite Lighting, Inc.* v. *Missouri*, 342 U. S. 421, 423 (1952) (court does "not sit as a super-legislature to weigh the wisdom of legislation nor to decide whether the policy which it expresses offends the public welfare"); *United States* v. *Carolene Products*, 304 U. S., at 154 (where "question is at least debatable," "decision was for Congress"). For that reason, the final product of the bargaining process may constitute evidence of a breach of duty only if it can be fairly characterized as so far outside a "wide range of reasonableness," *Ford Motor Co.* v. *Huffman*, 345 U. S., at 338, that it is wholly "irrational" or "arbitrary."

The approach of the Court of Appeals is particularly flawed because it fails to take into account either the strong policy favoring the peaceful settlement of labor disputes, see, *e. g.*, *Groves* v. *Ring Screw Works, Ferndale Fastener Div.*, 498 U. S. 168, 174 (1990), or the importance of evaluating the rationality of a union's decision in light of both the facts and the legal climate that confronted the negotiators at the time the decision was made. As we shall explain, these factors convince us that ALPA's agreement to settle the strike was not arbitrary for either of the reasons posited by the Court of Appeals.

## IV

The Court of Appeals placed great stress on the fact that the deal struck by ALPA was worse than the result the union would have obtained by unilateral termination of the strike. Indeed, the court held that a jury finding that the settlement

was worse than surrender could alone support a judgment that the union had acted arbitrarily and irrationally. See 886 F. 2d, at 1445–1446. This holding unduly constrains the "wide range of reasonableness," 345 U. S., at 338, within which unions may act without breaching their fair representation duty.

For purposes of decision, we may assume that the Court of Appeals was correct in its conclusion that, if ALPA had simply surrendered and voluntarily terminated the strike, the striking pilots would have been entitled to reemployment in the order of seniority. Moreover, we may assume that Continental would have responded to such action by rescinding its assignment of all of the 85–5 bid positions to working pilots. After all, it did rescind about half of those assignments pursuant to the terms of the settlement. Thus, we assume that the union made a bad settlement—one that was even worse than a unilateral termination of the strike.

Nevertheless, the settlement was by no means irrational. A settlement is not irrational simply because it turns out *in retrospect* to have been a bad settlement. Viewed in light of the legal landscape at the time of the settlement, ALPA's decision to settle rather than give up was certainly not illogical. At the time of the settlement, Continental had notified the union that all of the 85–5 bid positions had been awarded to working pilots and was maintaining that none of the strikers had any claim on any of those jobs.

A comparable position had been asserted by United Air Lines in litigation in the Northern District of Illinois.[9] Because the District Court in that case had decided that such vacancies were not filled until pilots were trained and actually working in their new assignments, the Court of Appeals here concluded that the issue had been resolved in ALPA's favor when it agreed to the settlement with Continental. See 886 F. 2d, at 1446. But this reasoning overlooks the fact

---

[9] *Air Line Pilots Assn. Int'l* v. *United Air Lines, Inc.*, 614 F. Supp. 1020 (ND Ill. 1985).

that the validity of the District Court's ruling in the other case was then being challenged on appeal.[10]

Moreover, even if the law had been clear that the 85–5 bid positions were vacancies, the Court of Appeals erroneously assumed that the existing law was also clarion that the striking pilots had a right to those vacancies because they had more seniority than the crossover and replacement workers. The court relied for the latter proposition solely on our cases interpreting the National Labor Relations Act. See 886 F. 2d, at 1445. We have made clear, however, that National Labor Relations Act cases are not necessarily controlling in situations, such as this one, which are governed by the Railway Labor Act. See *Trainmen* v. *Jacksonville Terminal Co.*, 394 U. S. 369, 383 (1969).

Given the background of determined resistance by Continental at all stages of this strike, it would certainly have been rational for ALPA to recognize the possibility that an attempted voluntary return to work would merely precipitate litigation over the right to the 85–5 bid positions. Because such a return would not have disposed of any of the individual claims of the pilots who ultimately elected option one or option two of the settlement, there was certainly a realistic possibility that Continental would not abandon its bargaining position without a complete settlement.

---

[10] Even if the Seventh Circuit had already affirmed the District Court's holding in the *United Air Lines* case, the Court of Appeals would have erred in its conclusion that the law was so assuredly in ALPA's favor that the settlement was irrational. First, a Seventh Circuit case would not have controlled the outcome in this dispute, which arose in the Fifth Circuit. Second, even if the *United Air Lines* decision had been a Fifth Circuit case, it was factually distinguishable and therefore might not have dictated the outcome regarding the 85–5 bid positions. In *United Air Lines*, the Seventh Circuit affirmed on the basis of the District Court's finding that the carrier's action was taken in bad faith, motivated by antiunion animus. 802 F. 2d, at 898; 614 F. Supp., at 1046. An equivalent finding was by no means certain in this case.

At the very least, the settlement produced certain and prompt access to a share of the new jobs and avoided the costs and risks associated with major litigation. Moreover, since almost a third of the striking pilots chose the lump-sum severance payment rather than reinstatement, see n. 1, *supra*, the settlement was presumably more advantageous than a surrender to a significant number of striking pilots. In labor disputes, as in other kinds of litigation, even a bad settlement may be more advantageous in the long run than a good lawsuit. In all events, the resolution of the dispute over the 85–5 bid vacancies was well within the "wide range of reasonableness," 345 U. S., at 338, that a union is allowed in its bargaining.

The suggestion that the "discrimination" between striking and working pilots represented a breach of the duty of fair representation also fails. If we are correct in our conclusion that it was rational for ALPA to accept a compromise between the claims of the two groups of pilots to the 85–5 bid positions, some form of allocation was inevitable. A rational compromise on the initial allocation of the positions was not invidious "discrimination" of the kind prohibited by the duty of fair representation. Unlike the grant of "super-seniority" to the crossover and replacement workers in *NLRB* v. *Erie Resistor Corp.*, 373 U. S. 221 (1963), this agreement preserved the seniority of the striking pilots after their initial reinstatement. In *Erie*, the grant of extra seniority enabled the replacement workers to keep their jobs while more senior strikers lost theirs during a layoff subsequent to the strike. See *id.*, at 223–224. The agreement here only provided the order and mechanism for the reintegration of the returning strikers but did not permanently alter the seniority system. This case therefore more closely resembles our decision in *Trans World Airlines, Inc.* v. *Flight Attendants*, 489 U. S. 426 (1989), in which we held that an airline's refusal, after a strike, to displace crossover workers with more senior strikers was not unlawful discrimination.

The judgment of the Court of Appeals is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*