Ann G. ELY, Plaintiff–Appellant,

v.

NEWELL–RUBBERMAID, INC; Local 302–L, United Steelworkers of America, AFL–CIO/CLC, Defendants–Appellees.

No. 01–3170.

United States Court of Appeals, Sixth Circuit.

Sept. 12, 2002.

Before DAUGHTREY and MERRITT, Circuit Judges; WEBER, District Judge.*

PER CURIAM.

Plaintiff–Appellant Ann G. Ely ("Ely") appeals from an order of the district court, granting separate motions for summary judgment by Defendants–Appellees New-

ell–Rubbermaid, Inc. ("Newell–Rubbermaid") and Local Union 302–L, United Steelworkers of America, AFL–CIO/CLC ("the Union"). For the reasons stated below, we affirm.

I.

In 1973, Ely began to work for Newell–Rubbermaid's predecessor company in Wooster, Ohio. She thereafter was employed by the company in various positions over the years. After suffering an injury which limited her ability to lift and to perform repetitive motions, she transferred to a custodian position in 1997. In that capacity, Ely volunteered to clean all restrooms in one of the company's buildings. In addition to cleaning those 11 restrooms, she was responsible for cleaning two stairwells, the computer room, the lobby, the cafeteria, the courtyard, and eventually, an ashtray located outside of the building's main entrance.

Shortly after undertaking the custodian position, Ely began to receive poor evaluations of her work performance. On November 3, 1997, she received her first written warning from the company, precipitated by her departure from the job site without speaking directly to the crew supervisor, Dedra (Dee) Hoffman. Although Ely contends that Hoffman was unavailable and that she spoke to a security guard in Hoffman's absence, Hoffman's deposition testimony indicates that she always was accessible by both cell phone and pager, with voice mail capabilities.

On December 19, 1997, Ely received a second written warning, for failure to perform her job duties in a satisfactory manner. At the same time, the company also imposed a disciplinary suspension. Con-

---

* The Honorable Herman J. Weber, Senior United States District Judge for the Southern District of Ohio, sitting by designation.

tending that such dual action contravened the progressive discipline format agreed upon by Newell–Rubbermaid and Union representatives, the Union filed a grievance on Ely's behalf, which resulted in rescission of Ely's suspension and her reinstatement with back pay. By the end of 1997, however, Ely had been through two steps of the company's progressive discipline procedure.

Ely received no further formal disciplinary notices over the next 11 months. Company files reveal that Ely had a significant number of illness-related absences during that period. When she was on the job, however, Ely received verbal warnings, was counseled on how to perform her job in accordance with company requirements, and, despite being given supplies and equipment to accommodate the physical limitations of which she complained, received assistance from others in performing her duties.

On November 16, 1998, another inspection of the areas that Ely was responsible for cleaning disclosed that her job performance still was not meeting the company's expectations. Specifically, Ely had not moved the chairs and had not swept around the tables when cleaning the cafeteria. She also did not wring out her mop sufficiently prior to mopping the restrooms, and did not properly clean mirrors, towel dispensers, partitions, sinks, stools, urinals and walls. Based on those deficiencies, the company invoked the third level of discipline contemplated by the collective bargaining agreement, suspending Ely for one day.

The next day, Hoffman arranged a training session with Ely to help her improve her work performance. Hoffman's typed notes of that session state as follows:

I(Dee) Work[ed] With Ann On Serveral [sic] Of The Restrooms[.] The Frist [sic] Restroom We Did I Showed Ann How I Would Clean It[.] The Next One We Cleaned Together. Ann Didn't Finish On[e] Task Before She Went To Another[.] She Would Clean A Sink Then She Would Clean A Toilet[,] Then Another Sink. I Felt That What Ever [sic] I Was Showing Or Telling Ann, She Wasn't Even Listening. I Also Felt I[was] Doing Most Of The Cleaning On The Last T[w]o Sets Of Restrooms. I Left Ann Do Them Alone[,] Then Came Back To Check, But The Results Were The Same.

(J.A. at 72)

Ely admits that subsequent inspections of her work areas still found her cleaning efforts to be unsatisfactory. After she suggested to her supervisors that her consistently poor evaluations could be due to an impossibly heavy workload, the company and the Union responded by conducting a joint time study. After following Ely for eight hours as she performed her daily duties, listing those responsibilities, and logging the time necessary to complete each facet of the job, both the company and the Union concluded that Ely had sufficient time to perform all assigned tasks.

On May 10, 1999, shortly after Ely returned to work following a leave of absence for medical testing, Hoffman asked Ely to clean a can of cigarette butts outside of the building's main entrance. Ely responded by requesting that a Union representative be brought in to "talk about whose job that is." Ely maintained that the chore was not part of her assigned duties, and that the company arbitrarily had assigned the additional task to her in her absence.

Union official Judy Marty was summoned to the area to defuse the confrontation. Marty went to Ely's supply closet, found a "sifter" there, and in "not more than two minutes," used it to remove the cigarette butts and dump them into a trash

bag held by Ely. Ely denied having seen the sifter or "strainer" before that date. She admitted, however, that even after May 10, she "did not use the strainer" to clean the ashtray, but "simply picked [cigarette butts] up with my fingers."

Roughly two weeks later, on May 26, 1999, maintenance supervisors received complaints from other employees about Ely's failure to vacuum behind the operator's desk in the lobby area. Upon inspection, company representatives found that in addition to failing to vacuum that area, Ely also had failed to mop bathroom floors and to clean the ashtray in the "high profile" lobby area. In light of the continued complaints regarding Ely's work after prior disciplinary attempts to modify her work habits, the company terminated Ely's employment on May 27, 1999, for "failure to meet work performance standards."

Ely objected to the discharge, contending that she must have been terminated in retaliation for a complaint that she previously had filed with the Occupational Safety and Health Administration,[1] or as a result of collusion between the company and the Union due to her contentious relationship with the local Union president's wife, a fellow employee.[2] Local Union president Michael Kendall prepared a grievance, which the Union filed on June 2, 1999, challenging the company's actions in terminating Ely. On June 11, 1999, the company informed Union representatives that the discharge would be upheld. By letter dated July 27, 1999, the Union advised Ely of two meetings at which any further action on her grievance would be discussed.

The local Union's executive board thereafter met to consider whether to recommend that Ely's case be taken to arbitration. Two of the 11 board members—Michael Kendall and Judy Marty—abstained from the vote. Seven of the nine remaining board members believed the Union had little chance of success in an arbitration proceeding, and thus voted against pursuing Ely's case further. The other two board members—Bill Shaner and Venus Wise—voted to pursue arbitration. Wise's vote, however, was based not on her knowledge of Ely's work performance, but rather on Ely's status as a long-term company employee. Concurring in the board's recommendation, a majority of the local Union's membership also voted not to contest Ely's dismissal before an arbitrator.

With administrative proceedings envisioned under the collective bargaining agreement thus concluded, Ely filed suit in federal district court, alleging a breach of the bargaining agreement by Newell–Rubbermaid, a breach of the duty of fair representation by the Union, a violation of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001–1461, and violations of various Ohio state laws. Upon the defendants' timely motions, the district judge entered summary judgment

1. Ely apparently initiated an O.S.H.A. complaint after Newell–Rubbermaid changed the brand of protective gloves it provided for her use, and Ely claimed to have developed a fungal infection as a result of the change. A company nurse had concluded that the new and previous gloves were of identical composition. (J.A. at 88–89; 616–17)

2. Marsha Kendall, another member of the Newell–Rubbermaid cleaning crew, was married to local Union president Michael Kendall. Mrs. Kendall told company officials about a confrontation between Mrs. Kendall and Ely related to Ely supposedly sweeping dust into an area that Mrs. Kendall already had cleaned. (J.A. at 722–24, 725–27). Additionally, on May 21, 1999, Mrs. Kendall filed a written report with Hoffman, complaining about an incident in which Ely allegedly pushed and then abandoned a running vacuum cleaner next to Mrs. Kendall while Mrs. Kendall was talking on the cafeteria telephone. (J.A. at 731–32, 737).

in favor of the defendants on the plaintiff's hybrid § 301 claim and on the ERISA claim that Ely had abandoned in the district court. The court also dismissed without prejudice all supplemental state law claims advanced by the plaintiff. On appeal, Ely contests only the decision resolving the § 301 claim in favor of the company and the Union.

## II.

This Court reviews *de novo* a district court's grant of summary judgment. *See Cockrel v. Shelby County Sch. Dist.*, 270 F.3d 1036, 1048 (6th Cir.2001), *petition for cert. filed*, 70 U.S.L.W. 3669 (U.S. Apr. 15, 2002) (No. 01–1548). Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). No genuine issue of material fact exists "unless a reasonable jury could return a verdict for the nonmoving party." *Preferred Props., Inc. v. Indian River Estates, Inc.*, 276 F.3d 790, 801 (6th Cir.), *cert. denied*, —— U.S. ——, 122 S.Ct. 2663, 153 L.Ed.2d 838 (2002) (quoting *Cockrel*, 270 F.3d at 1048). Additionally, "[i]n reviewing a grant of summary judgment, we view the evidence in the light most favorable to the nonmoving party." *Id.*

## III.

■ Ely's claims on appeal are brought pursuant to § 301 of the Labor Management Relations Act, 29 U.S.C. § 185. As to such "hybrid § 301 claims," "an employee must show both that the employer breached the collective bargaining agreement, and that the union breached its duty of fair representation." *Black v. Ryder/P.I.E. Nationwide, Inc.*, 15 F.3d 573, 576 n. 1 (6th Cir.1994). "Indeed, 'the case [an employee] must prove is the same

whether he sues one, the other, or both.'" *Id.* at 584 (quoting *DelCostello v. Int'l Bhd. of Teamsters*, 462 U.S. 151, 165, 103 S.Ct. 2281, 76 L.Ed.2d 476 (1983)). As a result, a plaintiff's failure to establish either the breach of the collective bargaining agreement or the breach of the duty of fair representation dooms the cause of action in its entirety.

### A. Breach of the collective bargaining agreement claim

■ In arguing that Newell–Rubbermaid breached the collective bargaining agreement by discharging her from her employment, Ely contends that the company failed to identify a specific rule violation precipitating the employment action; that, in violation of the principles espoused in *NLRB v. J. Weingarten, Inc.*, 420 U.S. 251, 95 S.Ct. 959, 43 L.Ed.2d 171 (1975), she was denied union representation when the company made its decision to discharge her; that the dismissal resulted from collusion between the company and the Union; and that Newell–Rubbermaid's denial of her grievance was untimely. In response, the company argues that the timeliness and *Weingarten* issues were not presented to the district court, and that irrespective of that omission, all Ely's allegations of error are without merit.

Ely's primary claim—that Newell–Rubbermaid failed to state a specific rule violation at the May 27, 1999, discharge meeting—does not raise a genuine issue of material fact. Contrary to Ely's assertions, the company was not obligated to identify a specific instance of misconduct by Ely that would justify the drastic discipline imposed. Pursuant to Article VI, Section 3(B) of the collective bargaining agreement, "[f]or purposes of progressive discipline there shall be three (3) separate categories of discipline"—attendance, tar-

diness and work rules.[3] In this case, the company had documented Ely's long history of performing her job duties in a less than satisfactory manner. After progressing through three levels of the agreed-upon disciplinary framework, Ely became subject to additional disciplinary consequences for failing to abide by "work rules" and to complete the tasks assigned her in an acceptable manner.

By May 26, 1999, the company had received new, verified complaints about Ely's failure to vacuum in the lobby area and to clean properly the restrooms for which she was responsible. Plaintiff argues that such dereliction of duty does not constitute a "work rule" violation which justifies progressive discipline. Were Ely correct, Newell–Rubbermaid employees in effect would be immune from any serious consequences for failure to perform the very functions for which they were hired. This Court rejects that proposition.

■ Ely also challenges her dismissal on the grounds that no supervisor inspected her cleaning work immediately following her shift. She submits that cleaning deficiencies noted later in the day could have resulted from activity which took place after she departed at the end of her shift (at 1:30 a.m.), but before the supervisors inspected the facility (sometime after 8:00 a.m.). The particular problems noted by the supervisor, however, seem unlikely to have accumulated over such a short period of time. Moreover, the restrooms' general state of uncleanliness over time and Ely's admitted failure to clean the ashtray consistently justify the disciplinary action taken. Ely thus has failed to establish a genuine issue of material fact in this regard as well.

■ Ely next suggests that the terms of the collective bargaining agreement require that an employee's actual supervisor meet with the employee and a union representative as soon as the company considers that employee's discharge, to discuss the possibility and merits of such discipline. In support of that argument, Ely offers the following additional provision of Article VI, Section 3(B) of the collective bargaining agreement: "Suspension/discharge or other loss of wages will be between the supervisor and the employee involved in the presence of a Union Officer."

Ely's intimation that she had a contractual right to be present with a union representative when company officials first determined that she should be discharged is not borne out by the contract language. The express terms of the collective bargaining agreement refer only to communication of the discharge decision to the employee. By allowing for union representation at such a time, the agreement contemplates permitting the employee to preserve evidence which could prove crucial in any future effort to contest the disciplinary action. Nothing in the contract language would support including the employee and her bargaining representative in the employer's actual employment decision-making process.

Neither does the Supreme Court's decision in *Weingarten* dictate the outcome which Ely desires. In *Weingarten,* the Court enforced a National Labor Relations Board order recognizing the right of an employee, upon request, to have union representation at investigatory interviews that the employee "reasonably believes may result in disciplinary action" against her. *Weingarten,* 420 U.S. at 267, 95 S.Ct. 959. As noted in the majority opinion in that case, guaranteeing such representation by a knowledgeable union official provides protection in instances where "[a] single

---

**3.** According to Ely's former supervisor, Thomas Johnson, the term "work rules" is synonymous with "assigned duties." (J.A. at 712)

employee confronted by an employer investigating whether certain conduct deserves discipline may be too fearful or inarticulate to related accurately the incident being investigated, or too ignorant to raise extenuating factors." *Id.* at 262–63, 95 S.Ct. 959.

By contrast, the same combination of factors is not present in this situation. Ely did not make a contemporaneous request for union representation while management officials inspected her work. Moreover, the *sine qua non* for *Weingarten* protection—an investigatory interview—neither was scheduled nor occurred at the time Ely claims to have had a right to the assistance of a union representative. Accordingly, the safeguards enunciated in *Weingarten* were unnecessary in the context of Ely's employment dispute.

Equally misguided is Ely's contention that the absence of her supervisor, Thomas Johnson, from the announcement of her discharge constituted a breach of the collective bargaining agreement. Although the contract does refer to meting out such discipline in the presence of "the supervisor," "the employee," and "a Union Officer," that provision does not mandate the attendance of any particular supervisor. In this case, Johnson only recently had returned to work after two months of cancer treatment, and was unaware of Ely's recent work-related problems. Under such circumstances, the company's designation of a former supervisor familiar with the employee and with evaluations of her work not only is permissible, but perhaps preferable.

Ely next contends that Newell–Rubbermaid breached the employment contract with the Union and its members by discharging her not for violation of any "work rule," but rather for reasons motivated by collusion between the company and the Union. According to Ely, her conflict with Marsha Kendall, the wife of the local Union president, so colored Ely's interactions with the company and the Union that both organizations conspired to remove her from her position. The record contains absolutely no evidence, however, to support such allegations. To the contrary, an affidavit of Carol LaScala, Newell–Rubbermaid's human resources manager who made the decision to discharge Ely, states that LaScala "had no knowledge on the date that [she] terminated Ms. Ely that there had been any incident where Ms. Ely allegedly ran a vacuum cleaner around Marsha Kendall's feet six days earlier." (J.A. at 442) Ely's allegation of collusion thus completely lacks factual substantiation.

In the final argument in support of her contention that Newell–Rubbermaid breached the collective bargaining agreement in discharging her, Ely argues that the company issued the notification of its denial of her grievance in an untimely fashion, and that pursuant to the contract, the grievance therefore should have been resolved in her favor. The company contends that Ely failed to proffer this argument in the district court and that such argument thus need not be addressed on appeal. This Court recently recognized, however, that even issues raised for the first time on appeal may be addressed if the proper resolution is beyond any doubt or injustice otherwise might result. *Pfennig v. Household Credit Servs., Inc.,* 295 F.3d 522, 532–33 (6th Cir.2002) (quoting *Blue Cross & Blue Shield Mut. Of Ohio v. Blue Cross & Blue Shield Ass'n,* 110 F.3d 318, 335 (6th Cir.1997)). The Court must examine the merits of the allegation in order to make such a determination.

Newell–Rubbermaid and the Union agreed in the collective bargaining agreement to a very specific grievance procedure. That agreement provides as follows, in pertinent part:

If there is not a mutually satisfactory settlement [of a grievance filed by the Union on an employee's behalf], the Company shall reduce to writing its final answer which shall be delivered to the Union within ten (10) working days. The grievance shall be considered settled on the basis of this final answer unless within thirty (30) days after receipt thereof, the Union shall notify the Company in writing of its desire to submit the unsettled issue or issues to arbitration. In the event the Company does not deliver to the Union its final answer within the above ten (10) working day period, the grievance shall be considered settled on the basis of the settlement requested by the Union at this step 2 meeting.

Article I, Section 3(c) (emphasis added).

In this instance, the Union filed its grievance on Ely's behalf with the company on June 2, 1999, and the company considered and denied the request for reinstatement on June 11, 1999, in the presence of Ely and Union representatives. Although written verification of that decision was not delivered to the Union until August 2, 1999, well after the contractual ten-day period, all parties were aware of the formal grievance procedure's outcome from the date of the initial denial. In fact, Union president Michael Kendall admitted in his deposition that he received a response from the company immediately after the hearing. Furthermore, by letter dated July 27, 1999, almost one week prior to formal notification of the grievance denial, the local Union secretary informed Ely that the local's executive board would discuss the denial at an August 3, 1999 meeting, and at an August 8, 1999 general membership convocation. Because all interested parties were aware that the company had denied the grievance, the objective underlying the relevant contract provision—to assure timely communication of the company's decision to the Union—was satisfied. As no one was prejudiced by the company's failure to deliver formal written notice in accordance with the contract's provisions, insistence upon compliance with a time line that the company and the Union apparently had agreed to waive would serve no purpose. Especially given that Ely failed even to raise this claim before the district court, the company's grievance decision will not be overturned based on Newell–Rubbermaid's delinquency in this regard.

### B. Breach of the duty of fair representation

■■■ Even if Ely were capable of establishing a breach of the collective bargaining agreement by Newell–Rubbermaid, she cannot succeed on her hybrid § 301 claim without also proving that the Union breached its duty to represent her fairly in its dealings with the company. "[A] union breaches its duty of fair representation if its actions are *either* 'arbitrary, discriminatory, *or* in bad faith.'" *Black*, 15 F.3d at 584 (emphasis in original) (quoting *Air Line Pilots Ass'n, Int'l v. O'Neill*, 499 U.S. 65, 67, 111 S.Ct. 1127, 113 L.Ed.2d 51 (1991)). *See also Vaca v. Sipes*, 386 U.S. 171, 190, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967). In turn, a union's actions will be considered "arbitrary" only if "in light of the factual and legal landscape at the time of the union's actions, the union's behavior is so far outside a 'wide range of reasonableness' as to be irrational." *O'Neill*, 499 U.S. at 67, 111 S.Ct. 1127 (citation omitted). Consequently, "[a] union does not ... have to exhaust every possible remedy requested by a member facing disciplinary action." *Black*, 15 F.3d at 585 (citation omitted). Instead, "a union acts arbitrarily only if 'it handles a grievance in a "perfunctory" manner, with caprice or without rational explanation.'" *Linton v. United Parcel Serv.*, 15 F.3d 1365, 1370 (6th Cir.1994) (quoting *Poole v.*

*Budd Co.*, 706 F.2d 181, 183 (6th Cir. 1983)).

Ely insists that the Union's handling of her grievance was "perfunctory," and also insists that the Union decision not to pursue arbitration of her claim was based upon the fact that she had had a series of disagreements with the wife of the local Union's president. Other than her unfounded assertions, however, Ely adduces no evidence in support of these claims. In fact, all evidence before this Court, including the deposition testimony of witnesses favorable to Ely, indicates that the local Union handled the request to take Ely's dispute to arbitration no differently than any other matter considered by the local's leaders and membership. Additionally, although he opined that Ely's grievance would not succeed in arbitration, Union president Michael Kendall abstained from voting when the executive board considered the matter. Indeed, of the 11 board members, two abstained, two voted to support Ely's claim, and seven felt that the company's documentation of Ely's work deficiencies was such that an impartial arbitrator would be unlikely to rule in the Union's favor. Most importantly, even had Union president Kendall been predisposed to withhold support from Ely for improper reasons, the local Union's general membership could have overridden the executive committee's recommendation by a simple majority vote. The membership's failure to do so even after Ely was given an opportunity to address them indicates a broad lack of support for further pursuing Ely's claim.

For the foregoing reasons, we AFFIRM the judgment of the district court.