# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 08-2051

_____

| | | |
|---|---|---|
| Richard Hansen, | * | |
| | * | |
| Plaintiff/Appellant, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | District of Nebraska. |
| Qwest Communications, Corporation; | * | |
| Qwest Business Resources, Inc., | * | |
| | * | |
| Defendants, | * | |
| | * | |
| Communication Workers of America, | * | |
| AFL/CIO, | * | |
| | * | |
| Defendant/Appellee. | * | |

_____

Submitted: December 11, 2008
Filed: May 6, 2009

_____

Before WOLLMAN, BYE, and RILEY, Circuit Judges.

_____

RILEY, Circuit Judge.

Richard Hansen (Hansen) filed an action in federal district court alleging his union, Communication Workers of America, AFL/CIO (Union), breached its duty of fair representation by failing to provide Hansen with full back pay damages after an arbitrator determined there was no just cause for Hansen's termination. The district

court[1] determined the Union did not breach its duty of fair representation and granted the Union's motion for summary judgment. Hansen appeals, and we affirm, substantially for the reasons given in the district court's opinion.

## I.     BACKGROUND

This case involves the interplay between two collective bargaining agreements. Hansen was employed by Qwest Business Resources, Inc. (Company) and was terminated in January of 2003 for allegedly falsifying Company documents. At the time of his discharge, Hansen was a member of a bargaining unit covered by a collective bargaining agreement (BRI Agreement), which was in effect from August of 1998 until August of 2003. The BRI Agreement contained a three step grievance procedure which provided final, binding arbitration as the final step. Under the BRI Agreement, a favorable arbitration result could entitle the employee to full back pay damages.

The other bargaining agreement at issue is the Qwest Corporation and Union Agreement (Qwest Agreement), which went into effect in August of 2003, after Hansen was discharged. As part of its grievance process, the Qwest Agreement provided an interim step of advisory, non-binding arbitration before a single arbitrator, also known as alternative dispute resolution (ADR). A favorable advisory ADR result under the Qwest Agreement would entitle an employee to a maximum of 18 months back pay. The Qwest Agreement provided either party the opportunity to submit the grievance to final and binding arbitration if dissatisfied with the result of the advisory ADR. Unlike the Qwest Agreement, the BRI Agreement in effect at the time of Hansen's termination did not contain an advisory ADR mechanism.

---

[1]The Honorable Laurie Smith Camp, United States District Judge for the District of Nebraska.

The Union grieved Hansen's discharge. The Company rejected the grievance at the first two steps, and the Union moved the grievance to the third step of the grievance procedure under the BRI Agreement. Between the second and third steps of the grievance procedure, the Company and the Union engaged in settlement negotiations to resolve the grievance, with the Company offering to settle for $5,000 with no reinstatement. Hansen rejected the Company's offer and, more than 19 months after his discharge, offered to settle for $50,000 (one year's wages) and no reinstatement. The Company rejected this offer.

After settlement negotiations failed, Union representative Mary Kay Pence (Pence) informed Hansen, based on her assessment of the merits of Hansen's grievance, Pence did not believe the Union could prevail at arbitration. Hansen appealed Pence's determination through the Union's internal appeal process. Leroy Christensen (Christensen), an administrative assistant to Union Vice President John Thompson, reviewed the appeal and determined, while Hansen's grievance would be difficult to win, it should be pursued.

Christensen approached Company representative Hugh Doherty (Doherty) about handling Hansen's grievance through the advisory ADR process found in the Qwest Agreement, with the understanding that if either party did not accept the advisory ADR result, the parties could submit the matter to binding arbitration under the BRI Agreement. Christensen stated in an affidavit that he decided to pursue advisory ADR in Hansen's case for a number of reasons, including: (1) binding arbitration can take many months, whereas the advisory ADR process was much more expeditious and would allow Hansen to be reinstated much sooner; (2) if Hansen was dissatisfied with the result of the advisory ADR, he retained the option of pursuing full arbitration under the BRI Agreement; (3) the advisory ADR's remedy of reinstatement and 18 months of back pay was worth more than Hansen's previous offer to settle for one year of back pay and no reinstatement; and (4) based on Christensen's experience with similar

-3-

grievances, Christensen did not believe the Company would settle for the amount Hansen was seeking.

On behalf of the Company, Doherty agreed to handle Hansen's grievance through the Qwest Agreement's advisory ADR process, and thereafter the grievance could be submitted to binding arbitration under the BRI Agreement. Christensen and Doherty testified they also agreed if Hansen prevailed at advisory ADR and both parties accepted the result, Hansen's back pay would be limited to 18 months. When Christensen called Hansen to tell him the Union had granted his appeal and the grievance would be proceeding to ADR, Christensen neglected to inform Hansen of the 18-month back pay cap.

In January or February of 2005, Jay Boyle (Boyle) was hired to replace Pence as the Union representative for Nebraska, and Boyle was assigned to Hansen's grievance. Boyle was not informed Hansen's back pay remedy was limited to 18 months if Hansen prevailed at ADR. Boyle believed Hansen would be entitled to full back pay if he prevailed at ADR. Boyle contacted Hansen in May of 2005 and explained both sides would have the opportunity to present their case to an arbitrator, who would decide whether the Company had just cause to terminate Hansen. Boyle further explained, if both sides accepted the arbitrator's decision, it would become final, but if either party rejected it, the party could demand full arbitration.

The only issue at the ADR hearing was whether the Company had just cause to discharge Hansen. Hansen achieved a favorable result at the ADR hearing—the arbitrator found the Company did not have just cause to discharge Hansen. On October 12, 2005, the Company informed the Union it had decided to accept the ADR decision, and Hansen was reinstated on October 31, 2005. On November 2, 2005, Boyle learned Hansen's back pay would be capped at 18 months. Boyle informed Hansen. Boyle thought the reason for the cap was because all employees who prevailed at ADR after the Qwest Agreement took effect were subject to such a cap. Boyle did not realize

until December of 2005 that the reason for the back pay cap was because Christensen and Doherty had agreed to submit Hansen's grievance to the Qwest Agreement's ADR procedure, including the 18-month back pay cap.

On January 26, 2006, the Company offered Hansen 18 months of back pay, which Hansen rejected. The Company agreed the Union could pursue the full back pay remedy under the BRI Agreement. Boyle wrote Hansen a letter informing Hansen he had the option either to accept the 18 months of back pay and reinstatement, or proceed to final and binding arbitration. Boyle's letter warned Hansen, "the [binding] arbitration hearing offers substantial risks. Though the arbitrator could agree with the finding of the advisory arbitrator, there is an equal possibility that the arbitrator could deny the grievance resulting in you losing your job and any back pay you have already gained through this initial process." Hansen refused to accept 18 months of back pay and also would not agree to binding arbitration under the BRI Agreement. Instead, he sued the Company[2] and the Union.

The district court granted summary judgment on Hansen's claims against the Union, finding Hansen had not put forth evidence to show the Union acted deceitfully, in bad faith, or dishonestly in negotiating the advisory ADR process with the Company, and Christensen's failure to inform Hansen of the back pay cap was a mistake which was, at most, negligence. Further, the court found Hansen was not prejudiced because he had the opportunity to reject the advisory ADR decision and proceed with full arbitration. On appeal, Hansen argues his rights are governed by the BRI Agreement because only that agreement was in effect at the time of his termination. Hansen also contends, because the parties accepted the advisory ADR result, the parties are bound by the advisory ADR finding that there was no just cause for his termination.

_____

[2]The district court granted summary judgment for the Company on Hansen's claims against the Company, and Hansen has not appealed the summary judgment on those claims.

## II. DISCUSSION

### A. Standard of Review

"We review a grant of summary judgment de novo, viewing the facts in the light most favorable to the nonmoving party." Schmidt v. City of Bella Villa, 557 F.3d 564, 571 (8th Cir. 2009) (citing Green v. City of St. Louis, 507 F.3d 662, 666 (8th Cir. 2007)). Summary judgment should only be granted where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. See id.; Fed. R. Civ. P. 56(c).

### B. The Union's Duty of Fair Representation

Hansen claims the Union breached its duty of fair representation by (1) using the Qwest Agreement's advisory ADR mechanism, including the Qwest Agreement's 18 month back pay cap, and (2) failing to inform Hansen of the 18-month back pay cap. To establish the Union breached its duty of fair representation, Hansen must show the Union's conduct toward him was "arbitrary, discriminatory, or in bad faith." Vaca v. Sipes, 386 U.S. 171, 190 (1967) (citations omitted). "[A] union's actions are arbitrary only if, in light of the factual and legal landscape at the time of the union's action, the union's behavior is so far outside a wide range of reasonableness as to be irrational." Air Line Pilots Ass'n, Int'l. v. O'Neill, 499 U.S. 65, 67 (1991) (internal quotation omitted). "Mere negligence, poor judgment, or ineptitude by a union is insufficient to establish a breach of the duty of fair representation." Buford v. Runyon, 160 F.3d 1199, 1202 (8th Cir. 1998) (citation omitted).

"The doctrine of fair representation is an important check on the arbitrary exercise of union power, but it is a purposefully limited check, for a 'wide range of reasonableness must be allowed a statutory bargaining representative in serving the unit it represents.'" United Steelworkers of Am. v. Rawson, 495 U.S. 362, 374 (1990) (quoting Ford Motor Co. v. Huffman, 345 U.S. 330, 338 (1953)). "Any substantive examination of a union's performance, therefore, must be highly deferential,

recognizing the wide latitude that negotiators need for the effective performance of their bargaining responsibilities." Air Line Pilots, 499 U.S. at 78 (citations omitted).

### 1.    Agreement to Submit Hansen's Grievance to Advisory ADR

Hansen argues the Union had no authority to modify his rights and remedies under the BRI Agreement by pursuing the interim step of advisory ADR. The duty of fair representation "may be violated when a union in bad faith or with dishonest purpose interferes with a right conferred on an employee by his employer, fails to take a grievance to arbitration, or waives the provisions of a collective bargaining agreement intended to benefit an employee." Emmanuel v. Omaha Carpenters Dist. Council, 535 F.2d 420, 423 (8th Cir. 1976). However, a union does not act in bad faith or with dishonest purpose merely by agreeing to submit a grievance to non-binding arbitration instead of binding arbitration. See Danylchuk v. Des Moines Register & Tribune Co., 128 F.3d 653, 654 (8th Cir. 1997) (reasoning the union's actions were not "arbitrary, discriminatory, or taken in bad faith" when, as part of overall negotiations for a new collective bargaining agreement, "the union dropped efforts to submit [the grievant's] case to binding arbitration, and consented to refer it instead to non-binding mediation").

There is no evidence the Union acted "in bad faith or with dishonest purpose" in agreeing to submit Hansen's grievance to advisory ADR. Christensen believed Hansen's case would be difficult to win. Thus, Christensen determined advisory ADR would be more beneficial to Hansen than full arbitration because: (1) binding arbitration can take many months, whereas the advisory ADR process was much more expeditious and would allow Hansen to be reinstated much sooner; (2) if Hansen was dissatisfied with the result of the advisory ADR, he retained the option of pursuing full arbitration under the BRI Agreement; (3) the ADR's remedy of reinstatement and 18 months of back pay was worth more than Hansen's previous offer to settle for one year of back pay; and (4) based on Christensen's experience with similar grievances, Christensen did not believe the Company would settle for the amount Hansen was

seeking. Hansen acknowledges he has no basis for believing any agreement between Christensen and Doherty was motivated by discriminatory, deceitful, or dishonest intent.

Further, Christensen did not waive or modify any of Hansen's rights under the BRI Agreement by agreeing to submit Hansen's grievance to advisory ADR. The Qwest Agreement's advisory ADR was an interim step, not a substitute for full arbitration under the BRI Agreement. Hansen retained the right to reject the advisory ADR result and submit the matter to binding arbitration with the possibility of full back pay as provided under the BRI Agreement.[3] In agreeing to pursue advisory ADR, Christensen simply obtained an additional hearing to which Hansen was not otherwise entitled under the BRI Agreement, and to which Hansen now claims he would never have agreed. Boyle achieved a favorable finding for Hansen at that hearing. As a result of Christensen's and Boyle's efforts to resolve Hansen's grievance, Hansen was immediately reinstated and the Company ultimately paid Hansen 18 months of back pay, a significantly higher sum than Hansen himself had offered to settle the grievance. We fail to see how the Union's decision to pursue advisory ADR could be considered "arbitrary, discriminatory, or in bad faith," Vaca, 386 U.S. at 190, or even prejudicial to Hansen.

### 2.    Eighteen-Month Limitation on Back Pay

Hansen contends a genuine issue of material fact exists regarding whether the decision to submit Hansen's grievance to advisory ADR under the Qwest Agreement also included a specific agreement to limit Hansen's back pay to 18 months under the Qwest Agreement. Hansen argues a genuine issue of material fact exists because Boyle initially believed Hansen was entitled to full back pay, and when Boyle learned

---

[3]The BRI Agreement did not provide Hansen with a standalone "right" to full back pay. Instead, the BRI Agreement's full back pay remedy was dependent upon the grievant first prevailing at full arbitration.

of the 18-month limitation, Boyle surmised the reason for the limitation was "all members and [pending] grievances migrate[d] to the Qwest/CWA agreement." Hansen claims it would constitute arbitrary conduct if the Union simply lumped Hansen's grievance with all other pending grievances under the Qwest Agreement. See Martin v. American Airlines, Inc., 390 F.3d 601, 606 (8th Cir. 2004) ("[A]rbitrary decision-making as to the merits of an employee's grievance may, in some circumstances, be shown where the union ignores the employee's complaint or processes the employee's grievance in a perfunctory manner." (citing Vaca, 386 U.S. at 194)).

Boyle's initial unawareness of Christensen's and Doherty's agreement to limit Hansen's back pay to 18 months under the Qwest Agreement's advisory and non-binding ADR process is insufficient to create a genuine issue of material fact. The two negotiators of the agreement in Hansen's case, Christensen and Doherty, both testified to the parameters of the agreement—Hansen's grievance would be submitted to the advisory ADR process under the Qwest Agreement, but both parties retained the right to reject the advisory ADR decision and proceed to full arbitration. Boyle was not employed by the Union at the time Christensen and Doherty made the agreement regarding Hansen's grievance. There is no evidence Christensen and Doherty agreed to the advisory ADR procedure in the Qwest Agreement but did not agree to the back pay remedy limitations in the Qwest Agreement. No one testified Christensen and Doherty agreed to couple the Qwest Agreement's ADR procedure with the BRI Agreement's full back pay remedy. Instead, Doherty declared he and Christensen specifically agreed to "follow all provisions of Section 16 of the Qwest Agreement, which included an 18 month back pay remedy limitation."

Boyle's later belief regarding the reason for the 18-month back pay cap—that Hansen's grievance migrated to the Qwest Agreement with all other pending grievances—is also insufficient to create a genuine issue of material fact. There is no evidence Hansen's grievance was given cursory treatment by the Union or that Hansen's grievance was arbitrarily swept along and lumped under the Qwest

-9-

Agreement with all other pending grievances. Doherty declared the agreement between himself and Christensen was "unique to the Hansen grievance," and he knew of "no other pending grievance under the BRI Agreement [that] was submitted to the advisory ADR process or any other provision of Article 16 of the Qwest Agreement." The written correspondence between Christensen and Doherty supports their testimony that there was a specific agreement in Hansen's case to proceed under all the terms of Article 16 of the Qwest Agreement. We therefore conclude there is no genuine issue of material fact as to (1) whether there was a specific agreement in Hansen's case to follow the provisions of Section 16 of the Qwest Agreement, including the 18 month back pay limitation; or (2) whether the Union gave Hansen's grievance individualized consideration. Thus, there is no evidence to support setting aside the Union's agreement with the Company to limit back pay damages to 18 months as part of the advisory ADR process.

### 3. Failure to Inform Hansen of 18-Month Back Pay Limitation

The parties agree the Union failed to inform Hansen of the 18-month back pay limitation until November 2, 2005, when Boyle first learned of the back pay cap. Hansen argues "the [U]nion had a duty to disclose this [back pay limitation] to Hansen so that he could make an informed decision to proceed or not to proceed through ADR." Based upon the facts in this case, we do not agree.

It is the Union, not the individual employee, who decides how to proceed and whether to submit a grievance to arbitration. See Vaca, 386 U.S. at 191, 192 (reasoning unions have the "contractual power honestly and in good faith to settle grievances short of arbitration," and "[i]f the individual employee could compel arbitration of his grievance regardless of its merit, the settlement machinery provided by the contract would be substantially undermined"). Further, "while a union's failure to notify a grievant may be negligent and in poor judgment, such an omission, without anything more, does not violate a union's duty of fair representation." Demars v. General Dynamics Corp., 779 F.2d 95, 98 (1st Cir. 1985) (citations omitted); see also

<u>Buford</u>, 160 F.3d at 1202 ("Mere negligence, poor judgment, or ineptitude by a union is insufficient to establish a breach of the duty of fair representation.").

In finding the Union's conduct did not amount to a breach of the duty of fair representation, the district court reasoned:

> I decline Hansen's invitation to read anything more than negligence into Christensen's failure to communicate to Hansen the back-pay cap. In the exercise of due care, Christensen would have ensured that Hansen knew that an 18-month back-pay cap was in play, but the Court finds that his failure to do so is not legally sufficient to show arbitrariness. There is no evidence in the record to suggest that Christensen's silence was anything other than a mistake.

We agree. Christensen's conduct does not rise to the level of "arbitrary, discriminatory, or in bad faith" as required to establish a breach of the duty of fair representation. While it would have been better for everyone involved if Christensen had mentioned the back pay cap and the reason for the cap to both Hansen and Boyle, Christensen's failure to do so was, at most, negligence.

Further, Hansen learned of the back pay cap within a few days of his reinstatement and was thereafter given the opportunity to pursue binding arbitration, with the accompanying possibility of a full back pay remedy. Hansen chose not to risk losing what he had already gained—reinstatement and 18 months of back pay—for the uncertainty of prevailing at binding arbitration and obtaining reinstatement and full back pay. Hansen was simply not entitled to couple the advisory ADR's finding of no just cause with the BRI Agreement's remedy of full back pay. This coupling would be inconsistent with both the Qwest Agreement and the BRI Agreement. We see no evidence in the record that Hansen's decision not to pursue binding arbitration was a result of bad faith, discrimination, or arbitrary conduct by the Union.

-11-

## III. CONCLUSION

We affirm the district court's grant of summary judgment.

_____