NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 08a0699n.06
Filed: November 14, 2008

No. 07-5850

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| LOUIS COLE, JR., | ) | |
| | ) | ON APPEAL FROM THE |
| Plaintiff-Appellant, | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE |
| v. | ) | WESTERN DISTRICT OF |
| | ) | TENNESSEE |
| CLEO, INC.; and PAPER, ALLIED- | ) | |
| INDUSTRIAL, CHEMICAL AND ENERGY | ) | O P I N I O N |
| WORKERS INTERNATIONAL UNION, AFL- | ) | |
| CIO; and its LOCAL UNION NO. 5-1766, | ) | |
| Memphis, Tennessee, | ) | |
| | ) | |
| Defendants-Appellees. | ) | |

BEFORE:    KENNEDY, SUTTON and McKEAGUE, Circuit Judges.

McKEAGUE, Circuit Judge.  Plaintiff Louis Cole, Jr., a forklift operator, was fired for having negligently caused damage to company property.  When Cole grieved his termination, contending he was not responsible for the damage, the company offered reinstatement without back pay.  Cole rejected the offer, insisting he was entitled to back pay, and asked his union representative to pursue arbitration.  The union declined to do so, but Cole contends he was not aware of this refusal and assumed that application for arbitration had been made per his request.  When he finally learned that his termination had become final and the union had not applied for arbitration, he filed suit under § 301 of the Labor Management Relations Act, alleging his employer breached the

collective bargaining agreement and his union breached its duty of fair representation. The district court awarded the defendants summary judgment, finding the action time-barred and that, in any event, the record presented insufficient factual support for Cole's fair representation claim. On appeal, Cole insists there are genuine issues of material fact both in connection with application of the statute of limitations and on the merits of his claims. Cole has succeeded in identifying disputed questions of fact, but ultimately, they are not material. We therefore affirm the district court's judgment.

## I. BACKGROUND[1]

Plaintiff Louis Cole, Jr., was employed by defendant Cleo, Inc., manufacturer of paper products, from October 6, 1997 to September 8, 2004. The terms of his employment were defined by a collective bargaining agreement ("CBA") between Cleo and plaintiff's union, Paper, Allied-Industrial, Chemical and Energy Workers International Union, AFL-CIO and its Local No. 5-1766 ("the union"). Cole was working as a forklift operator at Cleo's warehouse in Memphis on September 7, 2004, when an overhead sprinkler was damaged, causing water to spray onto product inventory (wrapping paper). Cole claims not to know how the sprinkler was damaged; he discovered the problem when he began his overtime shift shortly after midnight and attempted to minimize damage while a co-worker summoned the shift supervisor. Cole dep. pp. 14-16, JA 259-61. When the shift supervisor, James Graham, arrived at the scene, he concluded, without even making inquiry of Cole, that Cole had caused the damage. Cole aff. ¶ 10, JA 306. Graham told Cole he didn't need

---

[1]This fact summary is based on review of the record in the light most favorable to plaintiff Cole, except where otherwise specifically noted.

to complete a written incident report. *Id.* at ¶ 11. Because he was wet, Cole left without completing his overtime shift. *Id.* at ¶ 12.

When he returned to work the next day, Graham met him with written notice of his termination, for "negligence resulting in damage or destruction of company property," a dischargeable offense under the CBA. Notice of Discharge, JA 687. Graham handed the notice to him without saying anything. Cole dep. pp. 19-23, JA 263-66. In response, Cole said nothing. He was stunned and frustrated: "I figured it was best not to say anything to him at the time because I didn't want to get any more frustrated than I was." *Id.* at 23, JA 266.[2] Union Steward Joe Bradley was present, but he didn't say anything either. Bradley left the building with Cole and, in the parking lot, filled out a grievance form for Cole to sign, alleging simply that the discharge was unjust and seeking return to work with back pay for lost time. Bradley dep. pp. 13-17, JA 743-44; Grievance Form, JA 697.[3]

---

[2]According to Graham, he questioned three of Cole's co-workers in the warehouse and determined that none of them had witnessed the accident. Observing that Cole alone was wet, he concluded that Cole's negligence was the cause of the accident. When he confronted Cole with this conclusion, Cole did not contradict it. Graham then sent Cole home and, after completing the damage clean-up, prepared the Notice of Discharge. Graham aff. ¶¶ 5-8, JA 310.

[3]Bradley testified that, at this time, Cole privately admitted to him that he caused the damage to the sprinkler. Bradley dep. pp. 12-13, JA 690-91. Cole reportedly explained to Bradley that he had stacked his forklift with a double-high order (because he was under pressure to keep up with other employees), raised the load too high, and accidentally struck the sprinkler. *Id.*

Cole denies that he ever admitted causing damage to the sprinkler. Cole aff. ¶¶ 20, 23, JA 307. He contends that Bradley, together with Union President Lee Anderson, fabricated the story "in order to cover their perfunctory handling of his grievance and lack of any investigation." Appellant's Reply Brief p. 5.

Because the grievance involved Cole's discharge, it proceeded directly to a third step meeting on October 19, 2004. In the meantime, within one week after his discharge, Cole had approached Ken Hardy in Cleo's Human Resource Department. Cole dep. pp. 108-09, JA 96-97. Hardy advised him within a week thereafter that he could have his job back if he agreed to waive recovery of back pay. *Id*. at 109, 132, JA 97, 105. Cole refused the offer because he didn't want to admit guilt for something he did not do. *Id*. Bradley then approached Hardy on Cole's behalf and received the same answer. *Id*. At the October 19 meeting, Cole was represented by Union President Lee Anderson. Cole spoke for himself at the third step meeting and Anderson presented his case just as Cole instructed him, contending the discharge was unjust because Cole had not caused the damage to the sprinkler. Anderson dep. p. 43, JA 120; Cole dep. p. 119, JA 100. To this point, Cole was satisfied with the union's handling of his grievance. Cole dep. at 119, 128, JA 100, 104. Yet, the company's position remained unchanged: Cole was offered reinstatement without back pay, which was unacceptable to him. *Id*. at 83, JA 90.

Cole then advised Anderson that he wanted to proceed to arbitration. Cole aff. ¶¶ 27, 29, JA 381; Anderson dep. pp. 66, 78, JA 130, 135. Cole did not receive an answer regarding arbitration, but the union took his grievance to a fourth step meeting. Cole aff. ¶ 29, JA 381; Cole dep. pp. 80, 93, JA 89, 93; Anderson dep. pp. 82-84, JA 136-38.[4] The fourth step meeting was conducted on

---

[4]Bradley testified that Cole asked him about arbitration, but he advised Cole it was not his decision to make; Cole would have to call Anderson. Bradley dep. pp. 38-39, JA 750. At some point Anderson told Bradley the union would not pursue arbitration, but Bradley did not so advise Cole, preferring to refer him to Anderson. *Id*. at 43-44, JA 751.

Anderson testified that he advised Cole the union would not pursue arbitration. Anderson dep. pp. 78, 82-84, 102-03, JA 135-40. Anderson made this decision following the third step

December 8, 2004. Cole was present but did not participate. Cole dep. p. 80, JA 89. Cole was thoroughly familiar with his rights under the CBA and knew this fourth step was the final step in the grievance process. *Id.* at 79-80, JA 88-89.

The company communicated its final position to Anderson in writing, dated December 20, 2004. JA 169. The company offered reinstatement with full seniority but no back pay. In addition, the company agreed to reduce the seriousness of the disciplinary warning notice from "third warning" to "second warning." *Id*. Cole was not provided a copy of this letter. Cole aff. ¶ 35, JA 382. In fact, Cole was not even told what the result of the fourth step meeting was. *Id.*; Cole dep. pp. 83, 90-91, JA 90-92. He had made it clear that he would not return to work unless he was also granted full back pay. *Id*. Yet, when he attempted to contact Bradley after the fourth step meeting to find out about the status of arbitration, he was unable to get a response. *Id.* at 93, 95, JA 93-94;

---

meeting after discussing it with the union executive board. He gave Cole two reasons for this refusal. First, the company had offered reinstatement, which was the primary relief sought in the grievance; the matter of back pay for a couple of weeks of missed work was relatively insignificant. Anderson thought it preferable for Cole to return to work and *then* continue negotiating for back pay. Second, the union knew that Cole had already admitted causing the damage, as Bradley had advised the executive board of Cole's admission. *Id.*; Bradley dep. pp. 30-31, 40-41, JA 748, 750. Hence, although Anderson thought Cole deserved reinstatement, he remained unpersuaded that Cole's grievance for back pay had such merit as to warrant arbitration. *Id.* at 82-83, JA 136-37.

Cole aff. ¶¶ 30, 36, JA 381-82.[5]  Cole did not attempt to contact Anderson anymore, because an

earlier telephone conversation between the two had gone badly.  Cole dep. pp. 82-83, JA 278-79.[6]

> Then came a period of silence, which Cole described as follows:
>
> I knew it ended in some kind of way, and I had to do something to see if I could get things going on, if it was headed to the Federal Court under the grievance process or if I had to do whatever I could with anybody that I could get in touch with before a period of time.  I couldn't get in touch with nobody.  I left voice mails on Ken Hardaway's (sic) phone.  I called Joe Bradley, and I never could get him.  And things just went into total silence and limbo for a period of time.

*Id.* at 84-85, JA 280-81.  Cole next sent a letter by certified mail to both Ken Hardy, on behalf of

Cleo, and Joe Bradley, on behalf of the union, on September 7, 2005.  JA 317-20.  The letter

requested written notice of the final decision on his termination.  It was delivered on September 8,

2005.  Cole did not wait for a response, however.  On September 8, he commenced this action by

filing his complaint in the Western District of Tennessee.  JA 1.

The complaint asserts a single cause of action, a hybrid action under § 301 of the Labor

Management Relations Act, 29 U.S.C. § 185, contending Cleo wrongfully discharged him and the

union breached its duty of fair representation.  The complaint prays for reinstatement with full

seniority, plus damages and back pay in the amount of $300,000.  In conjunction with its answer,

---

[5]Bradley testified that he always kept Cole informed about the status of his case.  Bradley dep. pp. 43-44, JA 751.  He acknowledged, however, that he did not advise Cole the union would not take his case to arbitration.  *Id*.

[6]Anderson explained that after receiving the company's final offer in the December 20, 2004 letter, he contacted Ken Hardy and made a final request for reconsideration, which was denied.  Anderson dep. pp. 88-90, 97-98, JA 492-96.  But Anderson had no further communication with Cole and received no further inquiry from Cole.  *Id.*

Cleo moved to dismiss the complaint as time-barred under the governing six-month statute of limitations. The district court denied the motion on May 23, 2006, concluding it could not be determined from the complaint when Cole's claim accrued, i.e., when Cole should reasonably have known that the union had abandoned his claim.

After discovery was completed, Cleo and the union both moved for summary judgment. The district court issued a 19-page opinion granting their motions on June 7, 2007. Even accepting Cole's version of the facts, the court concluded that Cole should have known by December 8, 2004 (i.e., the date of the fourth step meeting), that the union had elected to proceed under step four of the grievance process rather than pursue arbitration. Hence, the complaint, filed more than six months thereafter, was held to be untimely. Further, the court held that Cole failed to adduce evidence on which a reasonable jury could conclude that any deficiencies in the union's representation rose to the level of arbitrary and irrational conduct. On appeal, Cole insists the district court erred in both conclusions, contending there are genuine issues of material fact that preclude ruling as a matter of law.

## II. ANALYSIS

### A. Standard of Review

The court of appeals reviews *de novo* an order granting summary judgment. *Johnson v. Karnes*, 398 F.3d 868, 873 (6th Cir. 2005). Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The court must view the evidence in the light most favorable to the non-moving party and

draw all reasonable inferences in its favor. *Id*. Not just any alleged factual dispute between the parties will defeat an otherwise properly supported motion for summary judgment; the dispute must present a *genuine* issue of *material* fact. *Leadbetter v. Gilley*, 385 F.3d 683, 689-90 (6th Cir. 2005). A dispute is "genuine" only if based on evidence upon which a reasonable jury could return a verdict in favor of the non-moving party. *Hedrick v. W. Reserve Care Sys.*, 355 F.3d 444, 451 (6th Cir. 2004). A factual dispute concerns a "material" fact only if its resolution might affect the outcome of the suit under the governing substantive law. *Id*.

## B. Statute of Limitations

There is no dispute between the parties on the standards governing the timeliness inquiry. These standards are summarized as follows:

> The statute of limitations for filing a hybrid Section 301/duty of fair representation claim is six months. *DelCostello v. International Brotherhood of Teamsters,* 462 U.S. 151, 169, 103 S.Ct. 2281, 2293, 76 L.Ed.2d 476 (1983); *Schoonover v. Consolidated Freightways Corp.,* 49 F.3d 219, 221-22 (6th Cir.1995). Such a claim accrues when an employee discovers, or should have discovered with exercise of due diligence, acts giving rise to the cause of action. *Chrysler Workers Ass'n v. Chrysler Corp.,* 834 F.2d 573, 578 (6th Cir.1987), *cert. denied*, 486 U.S. 1033, 108 S.Ct. 2017, 100 L.Ed.2d 604 (1988). Perhaps most importantly, a party is not required to sue on a hybrid claim until the arbitration panel renders its final decision, or until the party reasonably should know that the union has abandoned the party's claim. *Schoonover,* 49 F.3d at 222.

*Wilson v. Int'l Bhd. of Teamsters*, 83 F.3d 747, 757 (6th Cir. 1996). As Cole's grievance was not taken to arbitration, the district court correctly determined that the critical question in this case is when Cole, in the exercise of due diligence, reasonably should have discovered that the union had abandoned his claim.

Although Anderson testified he told Cole right after the third step meeting that the union would not take his claim to arbitration, his position is refuted both by Cole's affidavit and deposition testimony, creating a genuine factual dispute. Nonetheless, because Cole acknowledged his familiarity with the terms of the CBA, and because the CBA clearly requires either party to give the other notice of its intention to submit the grievance to arbitration within five working days after the step three decision, the district court concluded that Cole should have known, within five days after the October 19 third step meeting, whether his right to arbitration had been preserved. Opinion p. 13, JA 767. Moreover, in any event, the court concluded that Cole, who acknowledged that step four was the final step in the grievance process, must have known at the time of the fourth step meeting on December 8 that the union's representation of him had come to an end. *Id.* at 13-14, JA 767-78. Cole contends both of the court's conclusions are premised on erroneous readings of the CBA terms. Cole appears to be right.

First, although the CBA requires "either of the parties," i.e., either the union or the company, to notify the other of its intention to seek arbitration within five working days after the step three decision, it does not explicitly require either party to notify the employee whose grievance is at issue. CBA Art. VIII, Arbitration, § 1(a), p. 18, JA 155. Nor does the CBA require either party to notify anyone of its intention not to pursue arbitration. One might reasonably expect the union to notify the employee if either party had notified the other of any intention regarding arbitration, but the CBA does not expressly require it and the five-day deadline clearly does not apply to any such communication. Hence, Cole correctly argues that his familiarity with the CBA terms did not

necessarily give rise to constructive notice that the union had forfeited any right to pursue arbitration as of five working days after the third step meeting.

Second, Cole argues his knowledge that the union had taken his grievance to step four on December 8, 2004, did not represent constructive notice that the union had decided against arbitration. Contrary to the district court's understanding of the CBA terms, Cole contends, arbitration and step four negotiations are not necessarily mutually exclusive, but may be complementary. The CBA provides that "[i]n the event the grievance is not settled in this Step [i.e., step three], then it may be referred by either party to Step 4 negotiation or arbitration." CBA Art. VIII, Grievance Procedure, Step 3, p.17, JA 154. Yet, dispelling any notion that step four and arbitration represent "either/or" options is explicit language under step four to the effect that "[p]rior to Arbitration, the grievance, if not settled, may be negotiated" between the union and the company. *Id.*, Step 4, p.18, JA 155. In other words, Cole, familiar as he was with the CBA terms, could reasonably have viewed the December 8 step four meeting as a precursor to arbitration.

Yet, the interpretational flaws in the district court's reasoning do not necessarily undermine the court's ultimate conclusion. We accept as true Cole's assertions that he told Anderson he wanted the union to take his grievance to arbitration and that Anderson failed to clearly communicate the union's refusal to him. Still, though Cole may have requested arbitration, he knew the decision to arbitrate or not was the union's prerogative. Cole dep. p. 111, JA 99. Further, although Bradley had advised Cole that he did not know about arbitration and that Cole would have to contact Anderson, Cole has not identified any representation by Anderson or anyone else that would support his

professed "belief" that the union had given timely notice of its intent to seek arbitration.[7] At best, he avers that Anderson did not inform him that the union had decided not to pursue arbitration. Considering Cole's thorough familiarity with his rights under the CBA, which subsumes his knowledge that the union was required to give notice of its intent to pursue arbitration within five days after the step three decision, Cole's unsubstantiated "belief" is exposed as nothing more than an unsupported assumption, a mere hope, a matter of wishful thinking.

It may not have been unreasonable for Cole to entertain such wishful thinking during the course of the step four negotiations. Yet, even accepting that neither Bradley nor Anderson communicated the company's December 20, 2004 decision to Cole, he still knew, after the December 8 step four meeting, that he did not return to work. He also knew the parties' positions had remained practically unchanged throughout the course of the negotiations. That is, since just a week or two after Cole's discharge, Cleo had consistently offered reinstatement without back pay and Cole had continued to insist on reinstatement with back pay. When the step four negotiations were concluded, Cole knew the grievance process had been completed. Cole dep. p. 80, 119, 125, JA 89, 100-01. There was no reason to believe the parties' impasse had been resolved or altered. Arbitration was the only remaining recourse—if the union had preserved the option by giving timely notice.

---

[7]Cole argues in his appellate briefs that Anderson affirmatively represented that the union *would* pursue arbitration. Appellant's initial brief pp. 12-13; reply brief p. 8. In support of the argument, he cites only his own affidavits; affidavits which are, however, devoid of evidence of any such affirmative representation. Cole affs., JA 303, 381. In both affidavits, Cole goes no further than to state that Anderson did not inform him that the union would *not* take his case to arbitration. Cole aff. ¶ 18, JA 303; Cole aff. ¶¶ 29, 37, JA 381-82.

It was reasonable, of course, for Cole to make inquiry of Bradley concerning arbitration. Yet, Cole received no answer from Bradley, as he deferred to Anderson. Obviously, if the union had in fact given the company notice of its intent to refer the matter to arbitration, it would have been a simple, ministerial task for Bradley simply to say so. The fact that he instead referred Cole to Anderson should have suggested to Cole that the answer was not that simple. Yet, Cole deliberately refrained from calling Anderson in order to avoid a potentially disagreeable encounter. Instead, he repeatedly called Ken Hardy and Bradley and left voice mail messages that were never returned.[8] Though their non-responsiveness is far from commendable, it certainly could not be reasonably construed as affording Cole any encouragement. Far from lending support to Cole's professed belief that the union had timely referred his case for arbitration, it should have been reasonably understood as signaling that Cole's wishful thinking was no longer justified. Even though the ensuing period of silence represented strong evidence that the union had in fact abandoned Cole's claim, and even though Cole recognized the urgent need to take some action if indeed he were "headed to Federal Court," he inexplicably took no action until nine months after the December 8, 2004 step four meeting.

The district court's conclusion that Cole should have known that the union's representation was completed as of December 8 is not appropriate. After all, Anderson still sought reconsideration

---

[8]This apparent antipathy between Anderson and Cole should have been a "red flag" to Cole. That is, even though Cole claims Anderson never told him the union would not take the case to arbitration, he implicitly acknowledges that Anderson was not sympathetic with or supportive of his claim. Putting two and two together (i.e., Anderson's antipathy and Bradley's silence), Cole should have realized the union had not preserved its right to seek arbitration by giving Cleo the required notice within five days after the step three decision.

of the company's step four decision sometime after December 20. Still, the question remains whether a trier of fact could reasonably find that Cole should not be held to have discovered, in the exercise of due diligence, that the union had abandoned his claim until sometime after March 7, 2005. We conclude the answer to this question is "no." Though Cole says he repeatedly tried to obtain information from Bradley and failed, his clear impression that Bradley was ignoring him should have put him on notice that the union had abandoned him. What other conclusion could reasonably be drawn? And in the face of Bradley's persistent silence, how can Cole's refusal to try to contact Anderson—the very one to whom Bradley had referred Cole for arbitration information—be viewed other than as a refusal to exercise due diligence?

Cole attempted to justify his refusal to call Anderson simply by quipping, "But Lee Anderson, I hope I never call him again because I probably would have invited him outside somewhere the way he was talking to me." Cole dep. p. 83, JA 90. Similarly, commenting on the period of frustrating silence, Cole testified:

> Well, they kept delaying and putting me off. I couldn't get in touch with nobody, couldn't communicate with nobody. I wasn't going to go out there and break no doors down and talk to nobody, because I wouldn't be in here, I would be in jail.

*Id.* at 94, JA 284. Cole thus casually dismissed two obvious and reasonable steps he could have taken to discover the union's position: a phone call to the union president and a personal visit to the workplace. He justified his failure to take these reasonable steps by implicitly characterizing them as too dangerous, because he has a short fuse. In other words, Cole would have the court excuse his noncompliance with his duty of due diligence because he perceives that he's been wronged and

he has a temper. The notion is facially nonsensical, of course, and Cole has cited no legal authority to support it.

Cole believes he was unjustly disciplined for a wrong he did not commit. But by his own testimony, we learn that he was offered the opportunity to return to work within less than two weeks—even before the grievance process began. The company refused to offer back pay, but this amounted to less than two weeks' wages—for work Cole did not do. Cole rejected the offer because he insisted the company absorb the cost of its mistake by paying for his involuntary leave of absence. Yet, it remained far from clear that the company had made a mistake. Hence, viewed from the company's (and the union's) perspective, its offer of reinstatement represented a generous compromise. Cole was not interested in compromise, however; he assumed a position of righteous indignation and took a stand on principle. Then, ostensibly blinded by this principle and through his own fault, Cole failed to exercise due diligence and failed to timely discover, as he reasonably should have, that the union had in fact abandoned his claim.

In our opinion, no reasonable jury could conclude other than that Cole should reasonably have discovered that the union had abandoned his claim sometime during the months of January and February 2005, as his phone calls were continuously ignored. It was during this period that his § 301 hybrid action accrued. Because such an action is subject to a six-month statute of limitation and Cole's complaint was not filed until more than six months after accrual of his claim, the hybrid action was properly held to be time-barred. We therefore affirm the district court's judgment in this respect.

### C. Merits of Fair Representation Claim

Although the determination that the action is time-barred obviates the need to consider the merits of Cole's claims, the district court employed alternative reasoning to support its award of summary judgment to the defendants. The court evaluated the merits of Cole's breach of duty of fair representation claim and concluded that even if the action had been timely brought, it would fail on the merits for lack of evidence that the union breached its duty. We find no error in this conclusion.

There is no dispute as to the applicable standard:

> A breach of the statutory duty of fair representation occurs only when a union's conduct toward a member of the collective bargaining unit is arbitrary, discriminatory, or in bad faith.... Though we accept the proposition that a union may not arbitrarily ignore a meritorious grievance or process it in a perfunctory fashion, we do not agree that the individual employee has an absolute right to have his grievance taken to arbitration.

*White v. Detroit Edison Co.*, 472 F.3d 420, 426 (6th Cir. 2006) (quoting *Vaca v. Sipes*, 386 U.S. 171, 190-91 (1967)). This court's substantive examination of the union's performance must be "highly deferential" and the union's decision whether or not to proceed to arbitration, in particular, is accorded a "wide range of reasonableness." *Id.* (quoting *Air Line Pilots Assoc., Int'l v. O'Neill*, 499 U.S. 65, 78 (1991)).

The district court ruled as a matter of law that the union's failure to pursue arbitration could not reasonably be deemed arbitrary, discriminatory or in bad faith. On appeal, Cole maintains that the union processed his meritorious grievance in a perfunctory fashion. Yet, as the district court recognized, Cole, by his own testimony, appears to have been satisfied with the union's handling of his grievance through the step four negotiations. Opinion p. 17, JA 771. Indeed, Cole testified that

up to the point of the decision not to arbitrate, the union went through all the proper steps. Cole dep. p. 119, JA 100. Cole's chief complaint is that the union wrongfully refused to pursue arbitration on his behalf. If the union had conducted a thorough investigation of the accident, Cole contends, the dearth of evidence supporting the company's finding that his negligence caused the damage to company property would have been exposed and the appropriateness of pursuing arbitration would have been apparent.

Even accepting Cole's version of the facts, when the union's decision not to arbitrate is viewed deferentially from its perspective, the decision simply cannot be characterized as arbitrary, discriminatory or in bad faith. In step three and step four negotiations, the union had obtained the company's offer to reinstate Cole with full seniority. Anderson understandably and reasonably considered this to be a substantially satisfactory resolution of the grievance. Anderson knew Cole wanted to press for back pay, but he reasonably concluded this relatively insignificant item of relief did not justify expenditure of union resources in arbitration. The union might have conducted a more thorough investigation of the accident, but there is no reason to believe it would have made a difference. There is no reason to believe there was any witness to the damage to the sprinkler, other than Cole himself, who might have absolved Cole of apparent responsibility. Both Bradley and Anderson could have done a better job of communicating with Cole, but there is no reason to believe better communication would have altered the union's decision not to arbitrate. If they had communicated better with Cole, he would have known earlier that the union had abandoned his claim, but this is a fact he should reasonably have discovered on his own in the exercise of reasonable diligence.

In sum, the district court correctly concluded there was no genuine issue of material fact and that the union was entitled to summary judgment on the fair representation claim.  This conclusion was and is fatal to Cole's claim against Cleo for wrongful discharge as well, because the two claims must proceed together if at all.

### III.  CONCLUSION

Accordingly, the district court's award of summary judgment to the defendants is **AFFIRMED**.